# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Case No. _____

K.B., in her individual capacity and as lawful guardian *ad litem* of L.B., and L.B.,

        Plaintiffs,

   v.

EDGECOMBE COUNTY PUBLIC SCHOOL BOARD OF EDUCATION; JOHN FARRELLY, Superintendent of Edgecombe County Public Schools, in his official capacity; MARC WHICHARD, Assistant Superintendent and Title IX Coordinator of Edgecombe County Public Schools, in his official capacity; CRAIG HARRIS, Southwest Edgecombe High School Principal, in his official capacity; BILLY STROTHER, Southwest Edgecombe High School Assistant Principal, in his official capacity; ALAINA RITTER, Southwest Edgecombe High School Teacher, ALYSSA PARRISH-STAFFORD, Southwest Edgecombe High School Teacher, DARA HARMON, Southwest Edgecombe High School Media Coordinator, in her official capacity; MILES STAFFORD, Edgecombe County Public School Teacher, in his official capacity; and REBECCA SUGG, Southwest Edgecombe High School Counselor, in her official capacity,

        Defendants.

**COMPLAINT FOR DAMAGES**

## PRELIMINARY STATEMENT

1.     K.B. and L.B. file this complaint against Defendants for their discriminatory, retaliatory and defamatory conduct against Plaintiffs following a completely foreseeable and preventable incident that occurred during a school-sponsored field trip.

2.     As set forth below, Defendants' disciplinary actions against L.B. constituted discrimination on the basis of sex in an education program receiving federal funds in violation of § 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), and its implementing regulations, 28 C.F.R. Part 54 (2000), 34 C.F.R. Part 106 (2010).

3.     Defendants retaliated against K.B. and L.B. for engaging in activities and asserting rights protected under Title IX in violation of Title IX and the North Carolina Whistleblower Act, N.C. Gen. Stat. §126-84, *et seq.*

4.     Defendants, by and through persons acting under color of state law, deprived L.B. of her federal constitutional rights in violation of 42 U.S.C. § 1983.

5.     Plaintiffs were injured and are entitled to recover damages caused by Defendants' negligent supervision and training, negligent and intentional infliction of emotional distress, and defamation in accordance with North Carolina State law.

## WAIVER OF GOVERNMENTAL IMMUNITY

6.     The Defendant School Board contracted with the North Carolina School Boards Insurance Trust (NCSBIT), which then contracted with a commercial carrier to provide excess liability insurance coverage to the Defendant School Board. By obtaining this insurance coverage, the School Board has waived its governmental immunity for claims between $150,000.00 and $1,400,000.00.

7.     Plaintiffs allege that their actual and compensatory damages in this action are in excess of $150,000.00.

8.     Moreover, the School Board cannot assert governmental immunity as a defense to Plaintiffs' 42 U.S.C. § 1983 claims under 42 U.S.C. §1988 or under the Constitutions of the United States and North Carolina.

9.     Defendants Farrelly, Whichard, Harris, Strother, Ritter, Parrish-Stafford, Harmon, Stafford, Sugg, and Doe, as public school employees, were or are both county employees and State employees as defined by the State Tort Claims Act. N.C. Gen Stat. § 143-300.13 *et seq.* The acts and omissions described in this Complaint were committed by these public school employees in the course of the employees' duties as public school employees.

10.     Although the State has not waived sovereign immunity for these individual State employees in the event that there is no commercial liability insurance, the State is responsible for the defense of State employees and for payment up to five hundred thousand dollars ($500,000.00) of any judgment awarded in a court of competent jurisdiction against a State employee minus the first

one hundred fifty thousand dollars ($150,000.00) which is paid by the State Board of Education. N.C. Gen. Stat. § 143-300.6.

## FACTUAL ALLEGATIONS

11.    L.B. is a seventeen (17) year old senior at Southwest Edgecombe High School ("SWE") in Pinetops, Edgecombe County, North Carolina.

12.    L.B. lives with her mother, Kimberly Biggs, an Edgecombe County Public Schools (ECPS) elementary school teacher. L.B.'s father committed suicide when L.B. was ten (10) years old. L.B.'s mother has not remarried.

13.    L.B. has been a student in the ECPS since 2007.

14.    Defendants allow L.B. to attend the ECPS as a transfer student, because her mother is an ECPS employee.

15.    L.B. is an academically talented student who was selected to attend the North Carolina Governor's School East ("Governor's School"), a statewide summer residential program for gifted and talented high school students. L.B. was notified of her acceptance on March 4, 2016. (Ex. 1.)

16.    At the end of her junior year at SWE, based on L.B.'s weighted grade point average (GPA), L.B. ranked at the very top of her class ("number one").

17.    On May 9, 2016, SWE notified L.B. that her academic achievement earned L.B. "the right and privilege to be a Junior Marshal." (Ex. 2.) As "[t]he Junior Marshal with the highest GPA (#1 in the Junior class)," L.B. was "designated as Chief Marshal." As Chief Junior Marshal, L.B.'s was required to attend the Senior Awards Night (May 19, 2016, 7:00 p.m.), Graduation Practice (June 10, 2016, 8:00 a.m.) and Commencement (June 10, 2016, 6:00 p.m.). (Ex. 2.)

18.    L.B. was also a member of the National Honor Society and donated many hours of volunteer service for the benefit of ECPS.

19.    On May 12, 2016, L.B. embarked on a four (4) day school-sponsored field trip to Washington, D.C. with the SWE History Club.

20.    Defendants Alyssa Parrish (Ritter), Dara Harmon, and Miles Stafford were all designated chaperones for this trip.

21.    Defendants provided parents with only a permission form and an outline of the itinerary. Defendants did not provide any information to parents prior to the trip regarding sleeping arrangements, emergency contact information of chaperones, or any safety guidelines or expectations for the trip.

22.    Defendants failed to supervise the minor students at all times during the field trip. In fact, the schedule created by Defendants allowed the students to wander Alexandria, Virginia and Washington, D.C. for hours at a time—completely unsupervised.

23.    The first evening of the trip, Thursday, May 12, 2016, Defendants organized an ice cream

social; however, Defendants did not require the students to attend. Instead of attending the social, three underage students, seventeen (17) year old D.M., seventeen (17) year old T.W., and eighteen (18) year old Bryan Orozco (hereinafter referred to as "Orozco") used this unsupervised time to hire construction workers to buy a case of beer for them. L.B. witnessed these students visit a "vape" shop where they purchased cigarettes and cigars, which they smoked in the garden center of a nearby LOWE's hardware store.

24.     Although Defendants orally informed students that they intended to check the students' rooms at 10:30 p.m., Defendants did not conduct room checks on the evening of May 12, 2016, nor did they follow any other reasonable procedures for a high school field trip, such as providing the students with their room numbers. The students were provided teacher cell phone numbers, but the teachers did not answer their phones when students called.

25.     At approximately 10:45 p.m., Plaintiff L.B. left her motel room to visit D.M., T.W., Orozco, and two (2) other students who were in another hotel room. Plaintiff L.B. witnessed the students drinking beer and whiskey and saw D.W. and Orozco go into the bathroom with marijuana they brought with them on the trip.

26.     After about an hour, two (2) of the students left the room to visit another room. Four (4) students remained—D.M., Orozco, T.W., and Plaintiff L.B.

27.     Plaintiff L.B. did not leave at that point, because her roommates were already asleep, and she did not have a room key. Even though she had just met Orozco on the trip, Plaintiff L.B. believed she would be safe with her long-time friends, D.M. and T.W.

28.     Around midnight, Plaintiff L.B. lay down on one of the beds, alone and fully clothed, and turned away from the others to sleep.

29.     Orozco emerged from the bathroom (where he had been with D.M. and the marijuana), lay down on the bed with Plaintiff L.B., and began pulling at her hooded sweatshirt and asking her to take it off.

30.     Plaintiff L.B. told him "no" several times and held the hoodie down. When D.M. emerged from the bathroom, he observed Orozco on the bed with Plaintiff L.B.

31.     Plaintiff L.B. called out to D.M., in an attempt to ward off Orozco's advances, saying: "I can't believe you're going to let this happen."

32.     D.M jumped in between Plaintiff L.B. and Orozco and then whispered something to Orozco, which caused them both to begin chuckling. Within minutes, both D.M and Orozco were touching Plaintiff L.B. and attempting to remove her clothing while she resisted and screamed to turn the lights off. As she was pleading with them to stop, she convinced them that they had to use protection. Plaintiff L.B. was hoping to delay them long enough to remove herself from the situation. She wanted to save herself from the embarrassment of the boys seeing scarring from a medical condition on her legs, the possibility of catching an STD or getting pregnant. Despite her pleas and resistance, the boys did not stop. Plaintiff L.B. became unable to control the situation.

33.     When Plaintiff L.B. stopped resisting, D.M. and Orozco took off her clothes. Plaintiff L.B.'s

very first sexual intercourse experience was with two intoxicated and "high" boys at once.

34. Without Plaintiff L.B.'s knowledge or consent, T.W. allegedly used his phone to record the sexual encounter from the other bed. According to Defendants, T.W. distributed the video of the sexual encounter on Snapchat.

35. Within a few minutes after the sexual activity started between Plaintiff L.B., D.M., and Orozco, T.W announced, "I'm next," and climbed on the bed.

36. Shortly thereafter, one (1) of the students actually assigned to the room knocked on the door to come in and go to sleep. Plaintiff L.B. returned to her motel room, knocking on the door until she woke up a roommate. Plaintiff L.B. then slept on the floor as all the beds were full in her assigned room.

37. The following day, May 13, 2016, Orozco expressed concern to Plaintiff L.B. that Plaintiff L.B. might report that the sexual encounter was not consensual, and Orozco might be convicted of rape. He pretended not to know what happened in order to hear Plaintiff L.B.'s point of view. He then made jokes about the sexual encounter.

38. On May 13, 2016, the students visited various tourist sites—again, without supervision for extended periods of time—around Washington, D.C.

39. When the students returned to the motel that afternoon, the Principal, Craig Harris ("Defendant Principal"), and Assistant Principal, Billy Strother ("Defendant Assistant Principal"), were waiting at the motel—with the Virginia police—to investigate the rumors of underage drinking that had circulated that morning.

40. Upon information and belief, the police issued D.M. and Orozco citations for underage possession of alcohol. Defendant Principal removed these two (2) students from the field trip and, upon information and belief, suspended these students for ten (10) days for violating the school rule prohibiting the possession of alcohol on a school-sponsored field trip.

41. Another student was added to Plaintiff L.B.'s room for the remaining two (2) nights, forcing Plaintiff L.B. to continue to sleep on the floor of her motel room.

42. For the remainder of the trip, the Defendants performed perfunctory room checks (i.e., "Is everyone here?") and taped the outside of the students' motel room doors. Plaintiff L.B. never witnessed or heard anyone check the tape in the morning. Because of moisture in the air, the masking tape had already begun peeling away on its own—rendering the tape useless as evidence of any tampering by the students.

43. Prior to returning to school, Plaintiff L.B. contacted D.M., who, along with Orozco, remained suspended from school for possession of alcohol on the school-sponsored field trip, upon information and belief.

44. Plaintiff L.B. asked D.M. about the administrators' investigation of the field trip. D.M. instructed Plaintiff L.B., if questioned, to "deny everything."

45. D.M. went on to instruct Plaintiff L.B. that even if the administrators presented her video evidence of the sexual encounter, D.M told Plaintiff L.B. to lie and say the video was taken on

a separate occasion.

46.   Plaintiff L.B. did not know what "video evidence" administrators might show her, because, at that point, she did not know any such evidence existed.

47.   On Tuesday, May 17, 2016, Defendants Rebecca Sugg ("Defendant Counselor"), Defendant Principal, and Defendant Assistant Principal questioned Plaintiff L.B. about rumors of a video involving the sexual activity. Plaintiff L.B. admitted to being in the motel room with the boys, but she denied the allegations of sexual activity.

48.   Defendants presented no evidence to Plaintiff L.B. to substantiate the rumors. (Ex. 3.)

49.   The following day, May 18, 2016, Plaintiff L.B. voluntarily returned to Defendant Counselor's office, because she was upset about the rumors of an alleged video and concerned that her mother, Plaintiff K.B., had also heard the rumors. (Exs. 3, 4.)

50.   Defendants had no actual knowledge that any video ever existed—and, upon information and belief, Defendants made no efforts to seize the phone(s) that allegedly had made or received the videos.

51.   Yet, Defendant Counselor—Plaintiff L.B.'s trusted advisor—began describing what she had heard from another student about the alleged video with enough details of the actual event to lead Plaintiff L.B. to believe video evidence actually did exist.

52.   Defendant Counselor then encouraged Plaintiff L.B. to admit to any involvement in any sexual activity. (Ex. 3.)

53.   Trusting Defendant Counselor, and afraid of additional repercussions, Plaintiff L.B. admitted to Defendants Principal and Counselor that she engaged in sexual activity on the trip.

54.   Defendant Principal then ordered Plaintiff L.B. to write up her statement, which he would later use as the sole basis of her suspension.

55.   Upon information and belief, the Defendant School District did not order any of the males involved in the incident to write a statement.

56.   Defendants Principal and Counselor left Plaintiff L.B. alone to write her statement. While left alone, Plaintiff L.B. electronically contacted D.M., through the Kik messaging application, to inform D.M. of her admission.

57.   At Defendant Principal's direction, Plaintiff L.B. wrote a "statement." In her statement, Plaintiff L.B. paraphrased the events of the evening, while trying to protect the inebriated students who induced her to have sex, recorded her without permission, and then published the video to her classmates.

58.   After Plaintiff L.B. provided her oral and written statements, no one informed Plaintiff L.B.— orally or in writing—of any disciplinary consequence even after she specifically asked what the consequences of the statement would be.

59.   The following day, May 19, 2016, Plaintiff L.B. returned to school prepared to serve in her

role as Chief Junior Marshal that evening.

60. At the start of the school day, Defendant Principal again called Plaintiff L.B. to his office to discuss her written statement, this time in the presence of Defendant Marc Whichard ("Defendant Assistant Superintendent/Title IX Coordinator").

61. The full extent of Defendant Assistant Superintendent/Title IX Coordinator's "investigation" was to ask Plaintiff L.B. questions regarding the alcohol and drugs in the room and verify T.W.'s involvement in the sexual activity.

62. Defendant Assistant Superintendent/Title IX Coordinator then shamed Plaintiff L.B. by expressing his personal disappointment in her actions and stating her family must also be disappointed in her.

63. Defendant Assistant Superintendent/Title IX Coordinator then guided Plaintiff L.B to an administrative room where she waited for several hours supervised by a man she did not know and who was never introduced to her. Plaintiff asked this man if she could use her phone to call her mother. He said "no." When this man had to step out of the office, he asked Assistant Principal Billy Strother to supervise Plaintiff L.B. During this time, Plaintiff L.B. was still denied the opportunity to contact her mother or access her cell phone. Assistant Principal Billy Strother instructed Plaintiff L.B. not to tell him anything about the situation.

64. Around lunchtime, Defendant Principal Craig Harris contacted Plaintiff K.B. at her school and asked her to come to SWE as soon as possible. Defendant Principal Craig Harris tried to explain the situation, saying that Plaintiff L.B. may receive long-term suspension, while Plaintiff K.B. was standing in the middle of her twenty-five (25) elementary students.

65. Defendant Principal Craig Harris continued to speak after Plaintiff K.B. explained that she was at work and not in a position to discuss the incident. Due to the nature of the situation, Plaintiff K.B. was not free to ask questions or to respond to his comments. Defendant Principal did not inform Plaintiff K.B. that Plaintiff L.B. had been suspended already. He only insisted Plaintiff K.B. "come as soon as possible."

66. When Plaintiff K.B. arrived at SWE, Defendant Principal informed Plaintiff K.B. he had suspended Plaintiff L.B. for ten (10) days. Defendant Principal provided Plaintiff K.B. a copy of the Discipline Referral and Notice of Suspension Form—a form that would be maintained in her cumulative record and provided to colleges upon request. (Ex. 5.)

67. Defendant Principal described "the nature of [L.B.'s] offense" as: "admit[ing] to having sexual intercourse with two male students and sexual contact with one additional male student" "[w]hile on a school fieldtrip." (Ex. 5.)

68. Defendant Principal identified the "Prohibited Conduct" as "Level Three: Sexual Harrassment [sic]."

69. Defendant Principal documented his "findings" on the discipline form: "[L.B.] engaged in sexual intercourse and contact with the male students while on a field trip." Defendant School District's own investigative notes document that, other than Plaintiff L.B.'s own statement, there is no evidence to corroborate Defendant Principal's "findings."

70. Defendant School District defines Level Three "Sexual Harassment" as: "No student shall physically engage in sexual harassment as defined in Policy 4315, which prohibits, among other things, any offensive touching of another person's private parts, including buttocks or breasts, or forcing or attempting to force another to engage in a sexual act against their will." Policy 4315 does not define "sexual harassment." (Exs. 6, 7.)

71. When Plaintiff K.B. requested a copy of the Board Policies, she was given a barely legible piece of paper with the board policies written in four (4) point font. Defendant Principal pointed to "Level Three: Sexual Harassment," apparently as some evidence that he was following Board Policy.

72. Contrary to the Board Policy, Defendant Principal did not, and could not, provide any evidence to Plaintiff K.B. that Plaintiff L.B. had ever offensively touched or otherwise sexually harassed anyone. Nor did Defendant Principal identify the person(s) whom Plaintiff L.B. had offensively touched or sexually harassed.

73. North Carolina law requires school principals to report certain acts to the local law enforcement agency, including "sexual assault," "sexual offense," and "possession of a controlled substance in violation of the law." N.C. Gen. Stat. § 115C-288(g).

74. Defendant Principal chose to selectively comply with the law: He contacted local law enforcement when he suspected D.M. and Orozco were in "possession of a controlled substance in violation of the law" while on the school field trip. Upon information and belief, Defendant Principal did not, however, notify local enforcement to investigate the sexual interactions described in Plaintiff L.B.'s statement to determine whether any "sexual offense" or "sexual assault" had actually occurred.

75. Defendant Principal refused to change the explicit and degrading language in the student discipline referral that will be maintained in Plaintiff L.B.'s permanent educational record and provided to colleges upon request.

76. Despite the fact that Plaintiff L.B. had been present at school on May 19, 2016, Defendant Principal refused Plaintiff K.B.'s request for Plaintiff L.B.'s suspension to start the following school day, May 20, 2016.

77. By refusing this request, Defendant Principal ensured that Plaintiff L.B. would not be able to serve as Chief Junior Marshal in the Senior Awards Ceremony that evening.

78. Plaintiff K.B requested to speak with Defendant Counselor to acquire more information regarding the evidence of sexual activity, particularly the alleged video. More importantly, Plaintiff K.B. was concerned that Plaintiff L.B. had been the victim of sexual assault. Plaintiff K.B. wanted to speak privately with Defendant Counselor to convey her suspicion and to request Defendant Counselor provide Plaintiff L.B. with counseling in a private setting. Defendant Principal denied the request.

79. Because Plaintiff L.B. attends school in the ECPS as a transfer student, Plaintiff K.B. expressed concern to Defendant Principal that Plaintiff L.B. would not be allowed to return to the ECPS next year. Defendant Principal assured Plaintiff K.B. that Plaintiff L.B.'s transfer would not be affected, because this was a short-term suspension.

80. After leaving SWE on May 19, 2016, Plaintiff K.B. went directly to the ECPS county office, where Plaintiff K.B. tried in vain to obtain copies of the Board Polices under which Defendant Principal suspended Plaintiff L.B.

81. Plaintiff K.B. was directed to speak with Defendant Assistant Superintendent/Title IX Coordinator. Defendant Assistant Superintendent/Title IX Coordinator refused to modify the disciplinary decision or the language of the referral and voiced his agreement with the manner in which Defendant Principal had conducted the investigation. He insisted that North Carolina laws did not apply to this situation, because the incident occurred in Virginia.

82. Defendant Assistant Superintendent/Title IX Coordinator assured Plaintiff K.B. that Plaintiff L.B.'s nomination to attend Governor's School would not be affected and that the Governor School officials would not be told about the incident unless Plaintiff L.B. herself told them.

83. In the presence of Plaintiff L.B., Defendant Assistant Superintendent/Title IX Coordinator then implied that Plaintiff L.B. left her room specifically for the purpose of having sex. Plaintiff K.B. immediately and emphatically expressed her disagreement with Defendant Assistant Superintendent/Title IX Coordinator's implications.

84. That same day, May 19, 2016, Plaintiff K.B. returned to the ECPS Central Office waiting area and observed Rose Cole, the employee with access to copies of the Board Polices that Plaintiff K.B. needed, enter the building. Ms. Cole signaled to Plaintiff K.B. to wait a few more minutes. Shortly thereafter, Defendant Assistant Superintendent/Title IX Coordinator informed Plaintiff K.B. that Ms. Cole would not be available to see Plaintiff K.B. that day. Defendant Assistant Superintendent/Title IX Coordinator intimidated Plaintiff K.B. so much that she left the building and went straight to an urgent care center where she presented with extremely high blood pressure. Despite advice from her doctor to rest, Plaintiff K.B. returned home to try to locate the policies on her own.

85. Defendant Assistant Superintendent/Title IX Coordinator effectively prevented Plaintiff K.B. from timely obtaining written copies of the Board policies, which Plaintiff K.B. needed in order to determine how to file an immediate appeal of the disciplinary action.

86. The following day, May 20, 2016, Plaintiff K.B. sent Defendant Principal an email, requesting that he put his statement, that Plaintiff L.B.'s transfer request would not be denied, in writing. Instead of replying to the email, and thereby documenting his statement in writing, Defendant Principal called Plaintiff K.B. and, again, assured Plaintiff K.B. that Plaintiff L.B.'s transfer request would not be affected.

87. Defendant Principal, again, refused to reconsider his decision to remove Plaintiff L.B. as Chief Junior Marshal—even though, with the exception of the Senior Awards Night, Plaintiff L.B.'s ten-day suspension did not interfere with any of the other events considered mandatory for Junior Marshals.

88. During the same conversation on May 20, 2016, Plaintiff K.B. notified Defendant Principal that she intended to file a formal appeal pursuant to the Grievance Policy. As Defendant Assistant Superintendent/Title IX Coordinator had prevented Plaintiff K.B. from receiving a copy of the policy or the paperwork the previous day from Rose Cole, Plaintiff K.B. continued researching how to appeal this decision to Defendant Superintendent.

89. On May 26, 2016, Plaintiff K.B. hand-delivered a grievance to Defendant Principal, which she believed to be in accordance with Defendant Board's grievance policy. The grievance specifically outlined multiple violations of ECPS' Board Policies and state and federal law by the employees of Defendant School District.

90. Only after Plaintiff K.B. submitted her grievance to Defendant Superintendent on May 26, 2016, did Rose Cole deliver information to Plaintiff K.B. about the actual process to file a grievance.

91. On May 31, 2016, fellow tutors in Plaintiff L.B.'s Tutor Tactics group—a volunteer tutoring group Plaintiff L.B. founded and led—informed Plaintiff L.B. that they were instructed by Leigh Ann Webb, upon information and belief, the ECPS' Leadership Academy Coordinator, to omit L.B.'s name from the project presentation to Defendant Board.

92. On June 1, 2016, Defendant Superintendent Farrelly met with Plaintiff K.B. to discuss her grievance. Defendant Superintendent began the meeting by reminding Plaintiff K.B. that he had "no patience" for "parents who do not know how to file a grievance" and "teachers who do not do their jobs" —intimating that he placed K.B. in both categories.

93. During the meeting, Plaintiff K.B., again, raised the issue of the discriminatory treatment of Plaintiff L.B. Defendant Superintendent stated that Plaintiff L.B. was given a "light sentence" considering her infraction. Defendant Superintendent did not comment on the severity of the "sentence" given to the male students.

94. When Plaintiff K.B. raised the issue of removing Plaintiff L.B.'s name from the Tutor Tactics presentation, Defendant Superintendent stated that the other students did not want to associate themselves with Plaintiff L.B.

95. After the meeting, Defendant Superintendent began making an unprecedented number of visits to Plaintiff K.B.'s elementary school. During these visits, Defendant Superintendent would walk down the hall on which Plaintiff K.B.'s classroom is located, stop outside her classroom, look inside, and then continue walking. Plaintiff K.B.'s fellow teachers even noted Defendant Superintendent's atypical presence and expressed their concern for Plaintiff K.B.

96. Defendant Superintendent's repeated and unprecedented visits to Plaintiff K.B.'s elementary school that week, his walks down the hall, and peering in Plaintiff K.B.'s classroom had the understandable, and arguably intentional, effect of intimidating Plaintiff K.B. for exercising her right to file a grievance.

97. On June 6, 2016, Defendant Superintendent issued a letter to Plaintiff K.B. outlining his decision to deny her appeal and the rationale for his decision to enforce Plaintiff L.B.'s suspension and formally revoke her title as Chief Junior Marshal. (Ex. 8.)

98. That same day, June 6, 2016, Defendant Superintendent and Assistant Superintendent/Title IX Coordinator rescinded L.B.'s nomination to Governor's School, a transparent act of retaliation against Plaintiffs K.B. and L.B. (Ex. 9.)

99. Defendant Superintendent also informed Plaintiff K.B. that the Defendant Board of Education ("Defendant Board") would not make a decision regarding Plaintiff L.B.'s transfer request—

the same request that had been approved for the past eight (8) years and which Defendant Principal assured Plaintiff K.B. was unaffected—until July 2016.

100. The revocation of the honors that Plaintiff L.B. earned for her academic achievements, coupled with the potential denial of the transfer request for her senior year of high school and the undeniable deleterious effects on her higher education opportunities, caused and continue to cause Plaintiff L.B. and Plaintiff K.B grave emotional distress, overwhelming anxiety, and depression.

101. On June 7, 2016, Plaintiff L.B. was scheduled to attend school to take her only remaining exam. Plaintiff L.B. did not arrive to take her exam. As Plaintiff L.B.'s father had committed suicide a few years earlier, Plaintiff K.B. was distraught to learn her visibly depressed daughter had not arrived at school to take her exam. Plaintiff K.B. left work and went straight home. After assessing the situation, Plaintiff K.B. contacted the mobile crisis unit who arrived that evening and developed a Crisis Plan with Plaintiff L.B.

102. The Crisis Plan developed on June 7, 2016, included "unknown outcome of Board meeting in July" as potentially triggering the onset of a crisis. (Ex. 10.)

103. Plaintiff L.B. felt anxious about returning to school to take the exam she missed, because she did not want to encounter the other students involved in the sexual encounter. However, when Plaintiff L.B. saw T.W., she felt a surge of anger rather than anxiety and wanted to leave school as quickly as possible.

104. On June 10, 2016, Plaintiff K.B. submitted her final appeal to the Defendant Board of the disciplinary decisions rendered by Defendants Principal, Assistant Superintendent/Title IX Coordinator, and Superintendent. (Ex. 11.)

105. The Defendant Board did not arrange to meet with Plaintiff K.B. until after the graduation ceremony, during which another student—a student without the highest GPA in the SWE junior class—was falsely recognized as the Chief Junior Marshal both during the ceremony and in the published online video. (Ex. 12.)

106. A three (3) member appeal panel of the Defendant Board met with Plaintiff K.B. on June 16, 2016, a mere three (3) days before Plaintiff L.B. was scheduled to arrive at Governor's School. At the beginning of the meeting, the appeal panel of the Defendant Board indicated it would issue a decision that evening; the panel did not. Instead, at the conclusion of the meeting, a member of the panel informed Plaintiff K.B. that Plaintiff K.B. would be notified in a few days of the Defendant Board's decision.

107. As Defendant Board did not issue a decision at the conclusion of the appeal, Plaintiff K.B. contacted Governor's School to inquire about Plaintiff L.B.'s status. Governor's School staff informed Plaintiff K.B. that Plaintiff L.B. was no longer on the list to attend and encouraged Plaintiff K.B. to contact the North Carolina Department of Public Instruction (DPI).

108. Plaintiff K.B. contacted Tom Winton, Governor's School Coordinator at DPI, who confirmed that he had personally spoken with Defendant Assistant Superintendent/Title IX Coordinator extensively about Plaintiff L.B. and the Defendant Assistant Superintendent/Title IX Coordinator's decision to submit the Nomination Recusal Form.

109.    According to Mr. Winton, Defendant Assistant Superintendent/Title IX Coordinator's rationale—that Plaintiff L.B. was unable to attend due to a violation of the Governor's School Code of Conduct—was illogical since Plaintiff L.B. had not yet attended Governor's School. Mr. Winton explicitly informed Plaintiff K.B. that actions prior to a student's attendance at Governor's School are not Honor Code violations. Tom Winton explained that, unfortunately, this summer would have been Plaintiff L.B.'s only opportunity to attend Governor's School. (Ex. 13.)

110.    Plaintiff K.B. requested a copy of the Nomination Recusal Form submitted by Defendant Assistant Superintendent/Title IX Coordinator. Despite the fact that Plaintiff K.B. was in the process of appealing Defendant Superintendent's decision, and had the right to appeal the decision under Defendant Board's Policy, Defendants Assistant Superintendent/Title IX Coordinator and Superintendent submitted the form on June 6, 2016, without waiting even the requisite five (5) days prescribed by Defendant Board's Policy for Plaintiff K.B. to appeal the decision. (Ex. 12.)

111.    On June 27, 2016, Defendant Board issued a written decision on Plaintiffs' final appeal from the June 16, 2016, hearing ("Grievance Appeal Decision"). (Ex. 14.)

112.    In the Grievance Appeal Decision, Defendant Board delineated Plaintiff K.B.'s complaints, including a lack of supervision on the field trip, and the disciplinary consequences Plaintiff L.B. received. (Ex. 14.)

113.    Although Defendant Superintendent had acknowledged during the appeal hearing that Plaintiff K.B. raised valid concerns about adult supervision on the trip, Defendant Board nonetheless concluded in the Grievance Appeal Decision that Plaintiff L.B.'s discipline was appropriate.

114.    After consideration of Plaintiff K.B.'s complaints, Defendant Board affirmed Defendant Superintendent's decision to discipline Plaintiff L.B. specifically for the sexual activity that had occurred on May 19, 2016. (Ex. 14.)

115.    Upon information and belief, the two (2) boys who engaged in sexual intercourse with L.B. were never punished for the sexual intercourse—only for the possession of alcohol and drugs.

116.    Upon information and belief, the student who allegedly recorded the video shared with other students, T.W., was not charged or punished for that offense, even though it constitutes the criminal offense of Second Degree Sexual Exploitation of a Minor. N.C. Gen. Stat. § 14-190.17.

117.    Upon information and belief, school officials never reported T.W. to law enforcement even though—and most likely because—T.W.'s father, Kevin West, is the School Resource Officer (SRO). As the SRO, Officer West could have confiscated his son's phone to search for the alleged video or attempt to recover evidence from the phone of another student. Upon information and belief, he did neither.

118.    Instead, Defendant Board gave T.W. the same ten-day suspension for "sexual harassment" given to Plaintiff L.B, despite the fact that T.W. did not come forward on his own accord as Plaintiff L.B. did.

119.  Upon information and belief, Defendants have not revoked any titles, honors, recognitions, or awards from any of the boys that engaged in sexual activity with Plaintiff L.B. To the contrary, D.W. was selected for the Keihin Apprenticeship Program this summer for which Defendant Board posted his accolade on its webpage. All three boys have been allowed to return to school for their senior year and to participate in all of their activities without any punishment or restriction.

120.  Prior to the start of the 2016-17 academic year, Defendant Principal informed L.B., without explanation, that she was no longer a member of the Leadership Academy, an honorary group of exemplary students from SWE. The Defendants have refused to allow Plaintiff L.B. to participate in National Honor Society or to continue with her Tutoring Tactics Community Outreach Program. She has been denied the opportunity to use the library to complete online assignments as she had done in previous years. She has felt so uncomfortable at SWE that she purchased her own laptop and stays at Edgecombe Community College for the majority of the school day until she is due to arrive for her class at SWE. This forced isolation has significantly impaired L.B.'s interaction with her peers.

## JURISDICTION AND VENUE

121.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

122.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a), which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

123.  Plaintiffs bring this action to redress a hostile educational environment and gender discrimination in accordance with the provisions of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein.

124.  Plaintiffs bring this action to redress deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

125.  This Court has supplemental jurisdiction over North Carolina state law claims pursuant to 28 U.S.C. § 1367.

126.  Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendants are located within the Eastern District of North Carolina and a substantial part of the acts or omissions giving rise to this complaint arose from events occurring within this judicial district.

127.  This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; 28 U.S.C. §§ 2201 and 2202; and 20 U.S.C. § 1682.

## PARTIES TO THE COMPLAINT

128. Plaintiff K.B. is the mother and lawful *guardian ad litem* of Plaintiff L.B. Plaintiff K.B. currently lives in, and at all relevant times hereto was a resident of, the County of Martin, State of North Carolina. At the time of events complained of herein, Plaintiff K.B. was a teacher at an ECPS elementary school and employed by ECPS.

129. Plaintiff L.B. is a seventeen-year-old female. Plaintiff currently lives in, and at all relevant times hereto was a resident of, the County of Martin, State of North Carolina. At the time of the events complained of herein, Plaintiff L.B. was a student attending the high school, SWE, within the ECPS District, a public educational institution located in the County of Edgecombe, State of North Carolina.

130. Defendant Edgecombe County Board of Education ("Defendant Board") is, and at all times relevant to this action was, a body politic and local board of education, as that term is defined in North Carolina General Statute § 115C, with the responsibility of providing school children, including L.B., full and equal access to the public educational programs and activities offered in Edgecombe County in accordance with state law and the North Carolina Constitution. As a local governmental unit, Defendant Board is a "person" as defined by 42 U.S.C. § 1983 (2000). Defendant Board is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

131. Defendant John Farrelly ("Defendant Superintendent") was, at all times relevant to this action, the Superintendent of the ECPS. As Superintendent, Farrelly owed a duty to implement all policies and rules adopted by the Department of Public Instruction and the State Board of Education for the organization and government of the public schools. The Superintendent is directed by the Board to regularly review the administration of student discipline and behavior management policies across the school system. The Superintendent is charged with the obligation to ensure that disciplinary practices are consistent with Board policies and discipline polices are applied fairly and consistently to all students irrespective of their gender. The Superintendent shall notify and inform his board of education, assistant superintendent, principals, assistant principals and teachers of such polices and rules, and work with all school personnel to achieve the best methods of school government. N.C. Gen. Stat. § 115C-276. Defendant Superintendent was a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. Defendant Superintendent is sued in his individual and official capacities.

132. Defendant Marc Whichard ("Defendant Assistant Superintendent/Title IX Coordinator") was, at all times relevant to this action, the Assistant Superintendent and Title IX Coordinator of the ECPS. As Assistant Superintendent, Defendant Whichard was responsible for implementing State polices and rules and for other duties as assigned by the Superintendent with the approval of the Defendant Board. N.C. Gen. Stat. § 115C-278. As the Title IX Coordinator, Mr. Whichard is responsible for ensuring that Defendants complied with Title IX. 34 C.F.R. § 106, *et seq*. Defendant Assistant Superintendent/Title IX Coordinator was a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. Defendant Assistant Superintendent/Title IX Coordinator is sued in his individual and official capacities.

133. Defendant Craig Harris ("Defendant Principal") was, at all times relevant to this action, the

Principal of SWE of the ECPS. As Principal, Mr. Harris was responsible for ensuring that all children attending SWE are afforded equal access to a public education and for carrying out the educational policies created by the Defendant or mandated by State and Federal law. Defendant Principal was responsible for investigating conduct that violates Board policy or the Code of Student Conduct. Defendant Principal was a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. He is being sued in his individual and official capacities.

134. Defendant Billy Strother ("Defendant Assistant Principal") was, at all times relevant to this action, the Assistant Principal of SWE of the ECPS. As Assistant Principal, Mr. Strother was responsible for ensuring that all children attending SWE are afforded equal access to public education and to carry out the educational policies created by the Defendant Board of Education or mandated by State and Federal law. Defendant Assistant Principal was a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. He is being sued in his individual and official capacities.

135. Defendant Alaina Ritter was, at all times relevant to this action, a SWE teacher within the ECPS, and a chaperone on the school-sponsored field trip during which one of the incidents giving rise to this action occurred. As a chaperone on a school-sponsored field trip, Defendant Ritter's responsibilities included supervising the students to ensure their safety. *See* Defendant Board Policy 1510/4200/7270. Defendant Ritter is a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. She is being sued in her individual and official capacities.

136. Defendant Alyssa Parrish-Stafford was, at all times relevant to this action, a SWE teacher within the ECPS, and a chaperone on the school-sponsored field trip during which one of the incidents giving rise to this action occurred. As a chaperone on a school-sponsored field trip, Defendant Ritter's responsibilities included supervising the students to ensure their safety. *See* Defendant Board Policy 1510/4200/7270. Defendant Ritter is a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. She is being sued in her individual and official capacities.

137. Defendant Dara Harmon was, at all times relevant to this action, a Media Coordinator and faculty member of SWE and a chaperone on the school-sponsored field trip during which one of the incidents giving rise to this action occurred. As a chaperone on a school-sponsored field trip, Defendant Harmon's responsibilities included supervising the students to ensure their safety. *See* Defendant Board Policy 1510/4200/7270. Defendant Harmon is a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. She is being sued in her individual and official capacities.

138. Defendant Miles Stafford was, at all times relevant to this action, a teacher at Tarboro High School within the ECPS, and a chaperone on the school-sponsored field trip during which one of the incidents giving rise to this action occurred. As a chaperone on a school-sponsored field trip, Defendant Stafford's responsibilities included supervising the students to ensure their safety. See Defendant Board Policy 1510/4200/7270. Defendant Stafford is a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. §143-300.13. He is being sued in his individual and official capacities.

Defendant Rebecca Sugg (Defendant "Counselor") was, at all times relevant to this action, the Counselor at SWE within the ECPS. As a school counselor, Ms. Sugg's responsibilities included providing responsive services through consultation with students, families and staff; individual counseling; crisis counseling; referrals; and peer facilitation. N.C. Gen. Stat. § 115C-316.1. Defendant Counselor is a county employee and a public school employee as defined by the State Tort Claims Act, N.C. Gen. Stat. § 143-300.13. She is being sued in her individual and official capacities.

## APPLICABLE LAW AND POLICY

139. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

140. Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. § 106.

141. 34 C.F.R. § 106.31(a) provides:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

142. 34 C.F.R. § 106.31(b)(4) provides:

> [I]n providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex: [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment.

143. 34 C.F.R. § 106.31(b)(7) provides:

> [I]n providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex: [o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

144. 34 C.F.R. § 106.8(b) provides:

> A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

145. To assess whether a school's disciplinary proceeding produced an erroneous outcome in violation of Title IX, courts typically apply a framework first introduced in *Yusuf v. Vassar*

*College*. 35 F.3d 709, 715 (2d Cir. 1994).[1] *John Doe v. Salisbury Univ.,* 123 F.Supp.3d 754, 765–66 (2015).  In an erroneous outcome case, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense" on the basis of gender bias. *Yusuf,* 35 F.3d at 715.  To state a claim for erroneous outcome discrimination, a plaintiff must allege:

   a)   "A procedurally or otherwise flawed proceeding";

   b)  "That has led to an adverse and erroneous outcome"; and

   c)  "Particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf at 715.*

The other framework introduced in *Yusuf* to assess discriminatory discipline is based on selective enforcement.  In "selective enforcement" cases, the "claim asserts that regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender. *Yusuf at 715.*

146.   Pursuant to 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

147.   The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

148.   The North Carolina Whistleblower Act provides:

   a)  "State employees shall be encouraged to report verbally or in writing to their supervisor, department head or other appropriate authority, evidence of activity by a State agency or State employee constitution a violation of State or federal law, rule or regulation. N.C. Gen. Stat. § 126-84(a).

   b)  "[I]t is the policy of this State that State employees be free of intimidation or harassment when reporting to public bodies about matters of public concern . . . ." N.C. Gen. Stat. § 126-84(b).

   c)  "No . . . State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location or privileges of employment because the State employee . . . reports . . . verbally or in writing, any activity described in G.S. §126-84 . . . ." N.C. Gen. Stat. § 126-85 (a)

   d)  "No State employee shall retaliate against another State employee because the

---

[1] *See, e.g., Mallory v. Ohio Univ.,* 76 Fed.Appx. 634, 638–41 (6th Cir.2003) (citing favorably to *Yusuf*); *Brzonkala v. Va. Polytechnic Inst. & State Univ.,* 132 F.3d 949, 961–62 (4th Cir.1997) (same), *rev'd en banc on other grounds,* 169 F.3d 820 (4th Cir.1999); *Doe v. Washington & Lee Univ.,* No. 6:14–CV–00052, 2015 WL 4647996, at 9–10 (W.D.Va. Aug. 5, 2015) (same).

employee . . . reports or is about to report, verbally or in writing, any activity described in G.S. 126-84. N.C. Gen. Stat. § 126-85 (a1).

## CLAIMS FOR RELIEF

## COUNT I

**Violation of Title IX of the Education Amendments of 1972 ("Title IX")**
**20 U.S.C. § 1681, *et seq.***
**Erroneous Outcome of Disciplinary Proceedings Motivated by Gender Bias**
**(Defendants Board, Superintendent,  Assistant Superintendent, Principal, Assistant Principal and Counselor in their official capacities)**

149.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

150.    Defendants discriminated against Plaintiff L.B. on the basis of sex in violation of Title IX.

151.    Defendants' decision to discipline Plaintiff L.B. for "sexual harassment" was an erroneous outcome motivated by gender bias.  Defendants punished Plaintiff L.B. for sexual harassment, an offense that she did not commit.  Defendants did not impose similar disciplinary procedures or punishments for the male students involved.

152.    Defendants' disciplinary proceeding involved procedural defects and an otherwise flawed and biased process that resulted in an erroneous outcome and Plaintiff L.B.'s wrongful discipline.

153.    The failure by Defendants Board and Superintendent to train Defendant Principal on how to investigate potential student-on-student sexual harassment constitutes deliberate indifference. This deliberate indifference, in part, led to the erroneous outcome of L.B.'s discipline.

154.    The following circumstances demonstrate that gender bias was a motivating factor behind the erroneous finding in violation of Title IX:

   a)    Any alleged investigation conducted by Defendants was cursory, biased, and intentionally incomplete;

   b)    There was no evidence to suggest L.B. sexually harassed D.M., Orozco, and T.W.;

   c)    Plaintiff L.B. was innocent of sexual harassment as defined by ECPS Board Policy 4300;

   d)    Defendant produced no evidence from any investigation to support that L.B. was the perpetrator of "unwanted or offensive touching" as required by the policy.

   e)    Plaintiff L.B., a female, was similarly situated to the male students, D.M., Orozco, and T.W., assuming *arguendo* they equally engaged in prohibited sexual activity.

Whereas, L.B., the female, was repeatedly punished for engaging in the prohibited activity, and continues to be punished by her removal from honorary societies to which she was previously a member. The male students were not subject to any such punishments.

f) Defendants exhibited a lack of interest in discovering the true nature of the underlying behavior that was the subject of L.B.'s discipline; and

g) Defendants Assistant Superintendent and Superintendent failed to follow the grievance procedure by submitting the Nomination Recusal Form to Governor's School without waiting the five (5) requisite days prescribed by Defendant Board's policy for K.B. to appeal the decision.

155. Defendants subjected Plaintiff L.B. to different rules of behavior and sanctions on the basis of her sex.

156. As a result of Plaintiff L.B.'s disproportionate discipline on the basis of her sex, Plaintiff L.B. was excluded from participation in, and denied the benefits of, academic and extracurricular educational programs operated by Defendant Board, a recipient of Federal funds under Title IX.

157. As a direct and proximate result of Defendants' discriminatory misconduct, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

a) Past, present and future psychological pain, suffering, and impairment;

b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

c) Monetary damages for intentional discrimination;

158. Plaintiffs are also entitled to equitable relief including, but not limited to:

i. Expungement of Plaintiff L.B.'s disciplinary record;

ii. Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.

## COUNT II

**Violation of Title IX of the Education Amendments of 1972 ("Title IX")**
**20 U.S.C. § 1681, *et seq.***
**Selective Enforcement of Disciplinary Proceedings Motivated by Gender Bias**
**(Defendants Board, Superintendent,  Assistant Superintendent/Title IX Coordinator,**

**Principal, Assistant Principal and Counselor in their official capacities)**

159. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

160. Regardless of Plaintiff L.B.'s guilt or innocence as to the charge of sexual harassment, the severity of the penalty was adversely affected by Plaintiff L.B.'s gender.

161. The following circumstances suggest that gender bias was a motivating factor behind the severity of the penalty imposed upon Plaintiff L.B. in violation of Title IX:

   a) Plaintiff L.B., a female, was disproportionately punished for the same violation that her male classmates committed;

   b) Upon information and belief, the two (2) boys who engaged in sexual intercourse with Plaintiff L.B. were never punished for the sexual intercourse and were punished only for the possession of alcohol and drugs. Neither boy received separate or additional punishment for the sexual conduct;

   c) Unlike the male students, Plaintiff L.B. did not engage in, nor did Defendants provide any evidence that Plaintiff L.B. engaged in, "any offensive touching of another person's private parts" or that Plaintiff L.B. "forc[ed] or attempt[ed] to force another to engage in a sexual act against their will";

   d) Upon information and belief, Defendants never contacted the police to report the criminal offense of Second Degree Sexual Exploitation of a Minor. N.C. Gen. Stat. § 14-190.17. Assuming, *arguendo*, that reporting the incident to the School Resource Officer, the father of the perpetrator, met their burden, Defendants never completed an actual investigation to determine the existence of any such video of the incident, or attempt to recover such video. (Ex. 15.)

   e) The rational cited by Defendant Assistant Superintendent/Title IX Coordinator for revoking Plaintiff L.B.'s acceptance into Governor's School was a pretext for discrimination, as Plaintiff L.B. had not violated the Governor's School Honor Code.

162. As a direct and proximate result of Defendants' discriminatory misconduct, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment;

   b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

   c) Monetary damages for intentional discrimination;

163. Plaintiffs are also entitled to equitable relief including, but not limited to:

    i.   Expungement of Plaintiff L.B.'s disciplinary record;

    ii.  Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

    iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.


## COUNT III


**Violation of Title IX of the Education Amendments of 1972 ("Title IX")**
**20 U.S.C. § 1681, *et seq.***
**Retaliation Against K.B. and L.B.**
**(Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator, Principal, Assistant Principal and Counselor in their official capacities)**

164.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

165.    Defendants retaliated against Plaintiffs K.B. and L.B. in violation of Title IX.

166.    When Defendant Principal suspended L.B. on May 19, 2016, Defendant Assistant Superintendent/Title IX Coordinator assured K.B. that L.B.'s suspension would affect neither L.B.'s admission to Governor's School nor L.B.'s transfer request to attend SWE for the 2016-2017 school year.

167.    K.B. engaged in activities and asserted rights protected under Title IX by filing a grievance on May 26, 2016 with the Defendants in which she challenges the discriminatory discipline of her daughter L.B. on May 19, 2016.

168.    K.B.'s grievance complained of sex discrimination and raised the issue of whether L.B. had been the victim, rather than the perpetrator, of sexual harassment:

    a)  D.W.  had propositioned L.B. over a period of months leading up to the incident.

    b)  L.B. "was taken advantage of" by the boys. (Ex. 16.)

    c)  L.B. was "coached as to how to handle the situation by others who were involved in the investigation."

    d)  L.B. was a virgin prior to the incident. (Ex. 15.)

169.    Defendant Board knew that K.B. engaged in activities and asserted rights protected under Title IX when she filed the aforementioned Grievance with Defendant Superintendent in accordance with Defendant Board's Grievance Procedure (Policy Code 1740/4010). (Ex. 17.)

170.    After K.B. filed her Grievance with Defendant Superintendent on May 26, 2016.

Defendants thereafter subjected Plaintiffs to additional adverse action, treatment, and conditions including:

a) Formally revoking Plaintiff L.B.'s title of Chief Junior Marshal on June 6, 2016;

b) Revoking Plaintiff L.B.'s admission into Governor's School by submitting a Nomination Recusal Form to the North Carolina Department of Instruction on June 6, 2016;

c) Omitting Plaintiff L.B.'s name from the Tutor Tactic Group's presentation per faculty member Leigh Ann Webb's instructions on May 31, 2016;

d) Defendant Superintendent's derogatory and arguably threatening comments (e.g., "I have no patience for teachers who did not do their jobs or parents who did not know how to correctly file a grievance") made to Plaintiff K.B. during their grievance meeting on June 1, 2016;

e) Defendant Superintendent walking down the hallway of Plaintiff K.B.'s classroom, watching Plaintiff K.B. through the door of her classroom, intimidating Plaintiff K.B. and any other teachers who may consider exercising grievance rights;

f) Defendant Assistant Superintendent/Title IX Coordinator denied Plaintiff K.B. access to the policies and forms that she needed to properly file an appeal; he refused to make any efforts to de-escalate the situation, to prevent or minimize Plaintiff L.B.'s public humiliation in front of other students, or to investigate thoroughly the additional information provided by Plaintiffs K.B. and L.B. regarding the circumstances of the sexual encounter.

g) Defendant Assistant Superintendent/Title IX Coordinator, the person charged with the legal obligation to know and convey to parents and students the protections of, and Defendant Board's responsibilities under, Title IX, did not inform Plaintiffs K.B. or L.B. of their rights under Title IX.

171. Pursuant to Policy 1740/4010, Plaintiff K.B. had the right to appeal the Superintendent's decision to the Board of Education. (Ex. 17.)

172. K.B. exercised that right and appealed Defendant Superintendent's decision to the Board of Education on June 10, 2016.

173. An appeal hearing with the Board of Education was held on June 16, 2016.

174. Defendants subjected Plaintiffs to adverse treatment after K.B. exercised her right to appeal Defendant Board's decision when Defendant Superintendent informed Plaintiff K.B. that L.B.'s transfer request was now undecided, when previously, Defendants had assured K.B. that L.B.'s transfer request would remain unaffected by the May 12, 2016, incident. Defendants also removed L.B. from the Leadership Academy without notice or reason and refused in-person and emailed requests for the reason for this removal.

175. Each time K.B. complained to Defendants of discrimination pursuant to Title IX, L.B.'s punishment increased, indicating a clear causal connection between K.B.'s protected

activity and the adverse action.

176. As a direct and proximate result of Defendants' discriminatory misconduct, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

    a) Past, present and future psychological pain, suffering, and impairment;

    b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

    c) Monetary damages for intentional discrimination;

177. Plaintiffs are also entitled to equitable relief including, but not limited to:

    i. Expungement of Plaintiff L.B.'s disciplinary record;

    ii. Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

    iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.

## COUNT IV

**Violation of Title IX Implementing Regulations**
**34 C.F.R. § 106 *et seq.***
**Failure of Title IX Coordinator to Fulfill His/Her Duties Pursuant to Title IX**
**(Defendants Board and John/Jane Doe, Title IX Coordinator in their official capacities)**

178. Plaintiff incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

179. Under the Title IX regulations, a recipient must designate at least one employee to serve as its Title IX coordinator.

180. The Title IX coordinator shall coordinate their efforts to comply with and carry out its responsibilities pursuant to Title IX, including any investigation of any complaint communicated to such recipient alleging its noncompliance.

181. The Title IX Coordinator's name is not published on the Defendant Board's official website.

182. Defendant Board and Defendant Assistant Principal/Title IX Coordinator failed to appropriately and sufficiently notify all of its students and employees of the name of the employee appointed to serve as the Title IX coordinator in violation of Title IX.

183. As a result of Defendants failure to notify all students and employees, including Plaintiffs

L.B. and K.B., of the name of the Title IX Coordinator, Plaintiffs were prevented from even trying to seek redress from said Title IX Coordinator.

184. Plaintiffs have since discovered the Title IX Coordinator's name, Marc Whichard, at the end of Policy 1710/4021/7230. (Ex. 18.)

185. Upon information and belief, and based on the records received in response to Plaintiff K.B.'s request for L.B.'s entire educational record, Defendant Assistant Superintendent/Title IX Coordinator did not investigate the alleged sexual harassment of D.M., T.W. and Orozco by L.B. Defendant Superintendent specifically instructed Plaintiff L.B. not to discuss the incident with anyone.

186. Upon information and belief, Defendant Assistant Superintendent/Title IX Coordinator failed to investigate the alleged sexual harassment of L.B. when T.W. filmed D.M. and Orozco engaging in a sexual act with L.B. and distributed the video to other students.

187. As a result of Defendant Assistant Superintendent/Title IX Coordinator's failure to investigate complaints of sex discrimination, and, in fact, to perpetrate the sex discrimination, Plaintiffs sustained, and continues to sustain, injuries for which she is entitled to be compensated.

188. As a direct and proximate result of Defendants' discriminatory misconduct, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

    a) Past, present and future psychological pain, suffering, and impairment;

    b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

    c) Monetary damages for intentional discrimination;

189. Plaintiffs are also entitled to equitable relief including, but not limited to:

    i. Expungement of Plaintiff L.B.'s disciplinary record;

    ii. Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

    iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.


## COUNT V

**Violation of 42 U.S.C. § 1983**
**(Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator, Principal, Assistant Principal and Counselor in their individual capacities)**

190.    Plaintiff incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

191.    Under the Fourteenth Amendment, Plaintiff had the right as a public school student to personal security, bodily integrity, equal access to an educational environment free from harassment and gender discrimination, and equal protection of the laws.

192.    Defendants were at all relevant times employees of ECPS and persons acting under color of state law, empowered and required by the State of North Carolina to, among other things, ensure an open and safe environment for educational services, free from sex-based discrimination.

193.    Defendants discriminated against Plaintiff L.B. based on her gender and in violation of her right to equal protection of the laws under the Fourteenth Amendment when:

   a)   Defendants failed to properly investigate D.M, T.W. and Orozco's sexual misconduct;

   b)   Defendants failed to take appropriate action or otherwise determine the true nature of the sexual encounter between Plaintiff L.B., D.M, T.W. and Orozco;

   c)   Defendant Assistant Superintendent/Title IX Coordinator failed to investigate Plaintiffs' claims of sex discrimination;

   d)   Defendants Board and Superintendent otherwise failed to train Assistant Superintendent/Title IX Coordinator, Principal, Assistant Principal and Counselor on Title IX investigation requirements and its prohibition on discriminatory discipline, amounting to a deliberate indifference to Plaintiff L.B.'s right to be free of discrimination and the obvious need for such training;

   e)   Defendants established a policy and custom of failing to train their employees regarding the requirements of a Title IX investigation.  Defendants demonstrated this policy and custom by:

      i.   Failing to provide adequate training in light of foreseeable consequences; and

      ii.  Ratifying the unreasonable actions of Defendant Principal and Defendant Superintendent, a final policy maker.

   f)   Defendants demonstrated deliberate indifference by refusing to even consider that students D.M., T.W. and Orozco sexually harassed Plaintiff L.B.;

   g)   Defendants failed to appropriately discipline D.M, T.W. and Orozco for their initiation of, and participation in, the sexual encounter with Plaintiff L.B.;

   h)   Defendants punished L.B. for an infraction that she did not commit; and

   i)   Defendants disproportionately punished Plaintiff L.B. for violation of a school policy that she did not commit, but refused to punish her male counterparts, D.M

and Orozco, for the same violation of school policy without any rational basis.

194. Defendants discriminated against Plaintiff L.B. in violation of her right to due process under the Fourteenth Amendment when:

    a) Defendants punished Plaintiff L.B. for an offense she did not commit, without conducting a fair and thorough investigation pursuant to Title IX; and

    b) Defendants rescinded Plaintiff L.B.'s admission to Governor's School while Plaintiff K.B. was in the process of formally appealing Plaintiff L.B.'s discipline, thereby depriving Plaintiff L.B. the procedural due process afforded to her under Defendant Board's own policies;

195. The acts by Defendants constitute a disregard for, and deliberate indifference to, Plaintiff L.B.'s constitutionally protected property interest in educational benefits under the Fourteenth Amendment to the United States Constitution.

196. Defendants knew or should have known that their response to a student's violation of the Code of Conduct, and the Defendant Board's subsequent disciplinary procedures must comply with federal law, particularly as outlined in Title IX's published and widely promulgated implementing regulations.

197. Defendants' actions and omissions were the proximate cause of Plaintiff's injuries, including lost educational opportunity, emotional distress, psychological damage, and defamation of character and reputation in the community.

198. As a direct and proximate result of Defendants' discriminatory misconduct, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

    a) Past, present and future psychological pain, suffering, and impairment;

    b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

    c) Monetary damages for intentional discrimination.

199. Plaintiffs are also entitled to equitable relief including, but not limited to:

    i. Expungement of Plaintiff L.B.'s disciplinary record;

    ii. Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

    iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.

**COUNT VI**

## Violation of North Carolina Whistleblower Act, N.C. Gen. Stat. §126-84, *et seq.*
### (Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator and Principal)

200.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

201.    Plaintiff K.B. is a North Carolina State employee.

202.    Defendant Board and Defendants Superintendent, Assistant Superintendent/Title IX Coordinator and Principal are all North Carolina State employees.

203.    Defendants engaged in activity that constituted a violation of North Carolina State and Federal law, rules, and regulations.

204.    Plaintiff K.B. reported both orally and in writing to her supervisors, Defendants Superintendent and Principal, and Defendant Board, evidence of activity by all Defendants constituting a violation of North Carolina State and Federal law, rules, and regulations.

205.    Plaintiff reported to her supervisors, Defendants Superintendent and Principal, evidence of State employees engaging in the following violations of State and Federal Law:

    a)  Negligent supervision;

    b)  Defamation;

    c)  Retaliation; and

    d)  Gender discrimination

206.    After K.B. reported the aforementioned violations, Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator, and Principal retaliated against K.B. by:

    a)  Formally revoking Plaintiff L.B.'s title of Chief Junior Marshal on June 6, 2016;

    b)  Revoking Plaintiff L.B.'s admission into Governor's School by submitting a Nomination Recusal Form to the North Carolina Department of Instruction on June 6, 2016;

    c)  Monitoring Plaintiff K.B. in her classroom in an attempt to intimidate Plaintiff K.B.; and

    d)  Reconsidering Plaintiff L.B.'s transfer request, when previously, Defendants assured Plaintiff K.B. that Plaintiff L.B.'s transfer request would remain unaffected by the May 12, 2016, incident.

207.    As a direct and proximate result of Defendants' retaliatory misconduct, Plaintiff K.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS

($10,000.00), the amount to be determined at trial. Plaintiff K.B.'s damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment;

   b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

   c) Monetary damages for intentional retaliation.

## COUNT VII

### Negligence
### (Defendants Superintendent, Principal, Assistant Principal, Ritter, Harmon and Stafford)

208.   Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

209.   Defendants Principal, Assistant Principal, Ritter, Harmon, and Stafford had a duty to supervise students while in the care and custody of the school system, including authorized school field trips. (Ex. 19.)

210.   Defendants owed L.B. a duty of ordinary care to protect students, including Plaintiff L.B., from injury and damage while on the school-sponsored field trip.

211.   Defendants failed to supervise L.B. and the other students during the field trip.

212.   As a result of Defendants' failure to supervise, three (3) male students engaged in sexual activity with Plaintiff L.B.

213.   As a result of Defendants' failure to supervise, T.W. committed Second Degree Sexual Exploitation of a Minor, N.C. Gen. Stat. § 14-190.16, by allegedly recording and distributing video(s) of D.M. and Orozco engaging in sexual activity with L.B. and distributed these videos to other students.

214.   Plaintiff L.B. suffered severe emotional distress as a result of the sexual encounter, the subsequent dissemination of the sexually explicit images taken of L.B., and the disproportionate discipline she received as a result of the sexual encounter.

215.   As a direct and proximate result of Defendants' negligence, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment; and

b) Medical bills, counseling, and other costs and expenses for past and future psychological care.

216. Plaintiffs are also entitled to equitable relief including, but not limited to:

    i. Expungement of Plaintiff L.B.'s disciplinary record;

    ii. Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

    iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.

## COUNT VIII

**Negligent Training and Supervision of Defendant Assistant Superintendent/Title IX Coordinator and Defendant Chaperones Parrish-Stafford, Ritter, Harmon and Stafford (Defendants Board, Principal, Assistant Principal and Superintendent)**

217. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

218. At all relevant times, Defendant Board was a recipient of Federal financial assistance and subject to the requirements of Title IX of the Education Amendments of 1972 (Title IX), which prohibits sex discrimination in education and activities.

219. As a local education agency in receipt of Federal financial assistance, Defendant Board had the duty to designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX.

220. Defendant Board is responsible for ensuring the designated Title IX Coordinator has the appropriate training. Defendant Superintendent is responsible for the administration of the system of Defendant Board's schools consistent with Defendant Board's policies and state and federal law.

221. The Title IX coordinator's primary responsibility is to coordinate the ECPS' compliance with Title IX and ensure the Title IX coordinator understands the scope of Title IX and Title IX's administrative requirements.

222. At all relevant times, Defendant Superintendent, who was a policymaker and administrator, owed the duty to train Defendant Assistant Superintendent/Title IX Coordinator concerning federal law and ECPS policies on the protections and regulations of Title IX.

223. Upon information and belief, Defendants Board and Superintendent failed to adequately train Defendant Assistant Superintendent/Title IX Coordinator concerning ECPS policies and federal law on the protections and regulations of Title IX.

224. As a result of Defendants Board and Superintendents failure to train, Defendant Assistant Superintendent/Title IX Coordinator unlawfully discriminated and retaliated against Plaintiff L.B. contrary to the protections afforded under Title IX. Furthermore, Defendant Assistant Superintendent/Title IX Coordinator unlawfully retaliated against Plaintiff K.B. for asserting her rights under Title IX and filing a grievance.

225. Defendant Superintendent, as the Superintendent of ECPS, had a duty to develop and enforce regulations necessary to ensure student safety and provide adequate supervision on school field trips. (Ex. 19.)

226. At all relevant times, Defendants Principal, Assistant Principal, and Superintendent, who were policymakers and administrators, owed the duty to train Defendants Ritter, Harmon, and Stafford concerning ECPS policies and state law on ensuring the safety of students, like Plaintiff L.B., during school-approved field trips.

227. According to the Edgecombe County Board of Education Policy Manual, Policy Code 3320, the Principal must approve all school trips in advance. School trips that involve travel out of state and/or an overnight stay must also receive prior approval from the Superintendent or designee. (Ex. 19.)

228. Upon information and belief, Defendants Principal, Assistant Principal and Superintendent failed to adequately train Defendants Ritter, Parrish-Stafford, Harmon, and Stafford regarding their duty to supervise and ensure the safety of the students on the overnight school-approved field trip.

229. As a result of Defendants' failure to train, Plaintiff L.B. and other students were left unsupervised during the school trip and engaged in illegal activities and prohibited sexual conduct.

230. As a direct and proximate result of Defendants' negligent training and supervision, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment;

   b) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

   c) Monetary damages for unlawful discrimination and retaliation.

231. Plaintiffs are also entitled to equitable relief including, but not limited to:

   i. Expungement of Plaintiff L.B.'s disciplinary record;

   ii. Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

   iii. Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.

## COUNT IX

**Negligent Infliction of Emotional Distress**
**(Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator,**
**Principal, Assistant Principal, Parrish-Stafford, Harmon, Stafford, Ritter, and Counselor)**

232.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

233.    Defendant failed to follow a duty of conduct imposed by law, i.e., the duty of ordinary care to protect Plaintiff L.B. from injury and damage, when they:

   a)  Failed to supervise Plaintiff L.B. and her fellow students on the field trip;

   b)  Failed to appropriately investigate and determine the true nature of the sexual encounter;

   c)  Discriminated against Plaintiff L.B. based on her gender;

   d)  Punished Plaintiff L.B. for the infraction of sexual harassment, which she did not commit; and

   e)  Disproportionately disciplined L.B. for her involvement in the sexual encounter.

234.    Defendants failed to follow that degree of care that a reasonable and prudent person would use under the same or similar circumstances.

235.    Plaintiff suffered severe emotional distress as a result.

236.    Defendants' negligence was a proximate cause of Plaintiff L.B.'s severe emotional distress, which Defendants should have foreseen as the natural and continuous sequence of their negligent actions.

237.    As a direct and proximate result of Defendants' negligent infliction of emotional distress Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial.  Plaintiff L.B.'s damages include, but are not limited to:

   a)  Past, present and future psychological pain, suffering, and impairment; and

   b)  Medical bills, counseling, and other costs and expenses for past and future psychological care.

238.    Plaintiffs are also entitled to equitable relief including, but not limited to:

   i.  Expungement of Plaintiff L.B.'s disciplinary record;

   ii.  Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

iii.  Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.

## COUNT X

### Intentional Infliction of Emotional Distress
### (Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator, Principal, Assistant Principal and Counselor)

239.  Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

240.  Defendant School District recklessly caused severe emotional distress to Plaintiff L.B.

241.  Defendant School District engaged in extreme and outrageous conduct when it:

   a)  Discriminated against Plaintiff L.B. based on her gender;

   b)  Disproportionately punished Plaintiff L.B. for the same, or lesser, violation of school policy than her male counterparts; and

   c)  Retaliated against Plaintiffs K.B. and L.B. for complaining of gender discrimination.

242.  Defendants' conduct exceeded all bounds usually tolerated by decent society.

243.  Defendants' conduct was recklessly indifferent to the likelihood it would cause severe emotional distress to Plaintiff L.B and K.B.

244.  Defendants' conduct in fact caused severe emotional distress to the Plaintiff including:

   a)  Plaintiff L.B.'s refusal to eat for three (3) days;

   b)  Plaintiff L.B.'s failure to attend school and take her last exam;

   c)  Required intervention of the mobile crisis team; and

   d)  The need for regular therapy appointments with a licensed clinical psychologist.

245.  As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial. Plaintiff L.B.'s damages include, but are not limited to:

   a)  Past, present and future psychological pain, suffering, and impairment; and

   b)  Medical bills, counseling, and other costs and expenses for past and future psychological care.

246.  Plaintiffs are also entitled to equitable relief including, but not limited to:

    i.  Expungement of Plaintiff L.B.'s disciplinary record;

    ii.  Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

    iii.  Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.


## COUNT XI

**Defamation**
**Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator, Principal, Assistant Principal, and Counselor)**


247.  Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

248.  Defendant School District defamed Plaintiff L.B. when, upon information and belief, it falsely communicated that L.B. was guilty of committing sexual harassment, to persons other than L.B. including, but not limited to Tom Winton at the Department of Public Instruction.

249.  As a proximate result of Defendants' defamatory statements, Plaintiff L.B. suffered actual harm including, but not limited to:

    a)  Impairment of reputation;

    b)  Impairment of standing in the community;

    c)  Personal humiliation; and

    d)  Mental anguish and suffering.

250.  As a proximate result of Defendants' defamatory statements, which Defendants published with knowledge and/or reckless disregard of whether it was false, Plaintiff L.B. suffered presumed damages which cannot be definitively measured in monetary terms, including, but not limited to:

    a)  Mental and physical pain and suffering; and

    b)  Lost educational, extracurricular, and scholarship opportunities.

251.  Defendants' defamatory statements were made with malicious, wanton and reckless indifference to the truth and to the effect the statements would have on Plaintiff L.B. and her rights.

252.  As a proximate result of Defendants' defamatory statements, Plaintiff L.B. suffered

damages including, but not limited to:

   a)  Impairment of reputation;

   b)  Impairment of standing in the community;

   c)  Personal humiliation; and

   d)  Mental anguish and suffering.

253.   As a proximate result of Defendants' defamatory statements, Plaintiff L.B. suffered pecuniary damages including, but not limited to:

   a)  Past, present and future psychological pain, suffering, and impairment;

   b)  Medical bills, counseling, and other costs and expenses for past and future psychological care; and

   c)  Attorneys' fees and costs.

254.   As a direct and proximate result of Defendants' defamation, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial.  Plaintiff L.B.'s damages include, but are not limited to:

   a)  Past, present and future psychological pain, suffering, and impairment; and

   b)  Medical bills, counseling, and other costs and expenses for past and future psychological care.

255.   Plaintiffs are also entitled to equitable relief including, but not limited to:

   i.    Expungement of Plaintiff L.B.'s disciplinary record;

   ii.   Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

   iii.  Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.


## COUNT XII

### Libel Per Se
**(Defendants Board, Superintendent, Assistant Superintendent/Title IX Coordinator, Principal, Assistant Principal, Harmon, Stafford, Ritter and Counselor)**


256.   Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

257.   Plaintiff L.B. is a private figure.

258. Defendant Board defines Level 3 "Sexual Harassment" as: "any offensive touching of another person's private parts, including buttocks or breasts, or forcing or attempting to force another to engage in a sexual act against their will." (Ex. 7.)

259. The Defendant wrote and caused to be printed the following statement on an ECS Discipline Form: that Plaintiff L.B. engaged in the "prohibited conduct" of "Level Three: Sexual Harassment."

260. The statement that Plaintiff L.B. engaged in "sexual harassment" is libelous on its face as Defendants knew, or had reason to know, that the Plaintiff L.B. did not sexually harass D.M, T.M., and Orozco as defined by the Defendant Board Student Code of Conduct. Defendants did not possess any evidence, nor was there any allegation, that Plaintiff L.B. offensively touched anyone or attempted to force anyone to engage in a sexual act against their will.

261. The Defendant published the statement by knowingly communicating the statement, distributing the statement, or causing the statement to be distributed, so it reached one or more persons other than the Plaintiffs.

262. Upon information and belief, Defendants published the statement to Plaintiff K.B.; Tom Winton, Governor's School Coordinator at the Department of Public Instruction; and Leigh Ann Webb, SWE faculty member, ECPS' Leadership Academy Coordinator and the NC Department of Public Instruction.

263. At the time of the publication, Defendants either knew the statement was false or failed to exercise ordinary care in order to determine whether the statement was false.

264. Plaintiff L.B.'s damages include loss of reputation and standing in the community, mental pain and suffering, humiliation, and embarrassment.

265. Prior to Defendants' libelous publication, Plaintiff L.B. was named as Chief Junior Marshal, an honor that she earned based on her *academic* accomplishments. This academic accomplishment would have been reported to any college, university, or scholarship committee to which Plaintiff L.B. applied. The honor would have also been included on the ECPS social networks and published in area newspapers.

266. Prior to Defendant's libelous publication, Plaintiff L.B. did not have a disciplinary record and had never received an out of school suspension. If a college, university, or scholarship committee to which Plaintiff L.B. applied requested information related to Plaintiff L.B.'s disciplinary record, the only response would have been that Plaintiff L.B. did not have a disciplinary record.

267. Plaintiff L.B.'s damages can be presumed to have occurred as a result of the publication by the Defendant with the knowledge that the statement was false or with reckless disregard for its truth or falsity.

268. As a proximate result of Defendants' defamatory statements, Plaintiff L.B. has suffered, and continues to suffer, damages including, but not limited to, past, present and future psychological pain, suffering, and impairment.

269.   As a proximate result of Defendants' defamatory statements, Plaintiff L.B. suffered pecuniary damages including, but not limited to:

a) Medical bills, counseling, and other costs and expenses for past and future psychological care; and

b) Attorneys' fees and costs.

270.   As a direct and proximate result of Defendants' libel per se, Plaintiff L.B. sustained, and continues to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial.  Plaintiff L.B.'s damages include, but are not limited to:

a) Past, present and future psychological pain, suffering, and impairment; and

b) Medical bills, counseling, and other costs and expenses for past and future psychological care.

271.   Plaintiffs are also entitled to equitable relief including, but not limited to:

i.   Expungement of Plaintiff L.B.'s disciplinary record;

ii.   Reinstatement of Plaintiff L.B.'s title as Chief Junior Marshal; and

iii.   Reinstatement of Plaintiff L.B.'s membership in all academic, leadership, and honorary societies to which she was previously a member.


**WHEREFORE,** every act or omission attributed to an employee of the Edgecombe County Public Schools was performed or omitted during the course and scope of that employee's employment with the Defendant Board.

**NOW THEREFORE,** Plaintiffs respectfully request that judgment be entered in their favor and against Defendant Edgecombe County Public School Board of Education and Defendants John Farrelly, Mark Whichard, Craig Harris, Billy Strother, Alaina Ritter, Alyssa Parrish-Stafford, Dara Harmon, Miles Stafford, and Rebecca Sugg as follows:

A.   Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of standing in her community, damage to her reputation, and her family's unreimbursed out of pocket expenses incurred in response to these circumstances;

B.   Punitive damages;

C.   Injunctive relief;

D.   Costs;

E.   Attorney's fees;

F.   And any other relief this Court deems just and proper.

## JURY DEMAND

Now Come the Plaintiffs, L.B. and K.B., by and through their attorneys, The Gahagan Law Firm, P.L.L.C. and McLawhorn & Associates, P.A., and demand a trial by jury.


Respectfully submitted this the 1st day of November, 2016


/s/ Stacey Gahagan
Stacey Gahagan
The Gahagan Law Firm, PLLC
3326 Durham Chapel Hill Boulevard, Suite 210-C
Durham, North Carolina 27707
(919) 942-1430
stacey@gahaganlaw.com
N.C. State Bar No. 44393


/s/ Serenity Rasmussen
Serenity Rasmussen
McLawhorn & Associates, P.A.
Post Office Box 8188
Greenville, North Carolina 27835
(252) 321-0473
srasmussen@mclawhornlaw.com
N.C. State Bar No. 44730
*Attorneys for Plaintiffs*