| | | |
|---|---|---|
| K.B and L.B., | ) | |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF** |
| v. | ) | **DEFENDANT BOARD'S** |
| | ) | **MOTION TO DISMISS** |
| EDGECOMBE COUNTY PUBLIC SCHOOL | ) | **PLAINTIFFS' SECOND** |
| BOARD OF EDUCATION, et al. | ) | **AMENDED COMPLAINT** |
| | ) | **L.R. 7.1(e), 7.2** |
| Defendants. | ) | |

Defendant Edgecombe County Board of Education, by and through undersigned counsel, submits this brief in support of its Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") filed contemporaneously with this Memorandum of Law pursuant to Local Rules 7.1(e), 7.2. For the following reasons, the Board respectfully requests that its Motion to Dismiss be GRANTED.

## STATEMENT OF THE CASE

Plaintiffs K.B. and L.B. filed a lawsuit against Defendant Edgecombe County Board of Education ("Board"), Defendant Superintendent John Farrelly, and several other Board employees on November 1, 2016. (DE 1) Plaintiffs amended their complaint prior to service on January 19, 2017. (DE 10) Plaintiffs served the Board and Superintendent with the Amended Complaint on January 23, 2017, and the Board and Superintendent Farrelly timely filed a Motion to Dismiss the Amended Complaint on March 6, 2017. (DE 37, 39) The remaining defendants filed a Motion to Dismiss on March 27, 2017. (DE 45) On May 17, 2017, Plaintiffs filed their response (DE 54) and moved for leave to amend the complaint a second time. (DE 55) The Board timely replied in support of its Motion to Dismiss on May 31, 2017 (DE 59) and opposed Plaintiffs' Motion For Leave to Amend Complaint on June 7, 2017. (DE 60) The remaining defendants also opposed Plaintiffs' Motion for Leave to Amend Complaint. (DE 61) On August 14, 2017, the Court allowed Plaintiffs' Motion for Leave to Amend and denied all of the defendants' pending motions to dismiss as moot on August 14, 2017. (DE 62) Plaintiffs filed their

Second Amended Complaint ("SAC") on August 18, 2017, with a corrected version on August 21, 2017. The Board timely filed a Motion to Dismiss the Second Amended Complaint on September 15, 2017. (DE 67)

## FACTS AS ALLEGED BY PLAINTIFFS' SECOND AMENDED COMPLAINT

At all pertinent times to the allegations in the SAC, Plaintiff L.B. was a student at Southwest Edgecombe High School ("Southwest"), and her mother, Plaintiff K.B., was an employee of the Board. (SAC ¶¶ 47, 48 (unless otherwise specified all paragraph references hereinafter are references to the SAC).) On May 12, 2016, during L.B.'s junior year, she attended a school-sponsored field trip to Washington, D.C., with the Southwest Edgecombe History Club. (¶ 56.) Prior to the trip, L.B. had been notified that she had been accepted to Governor's School, which is "a summer residential program for intellectually gifted high school students," and that she had been designated as Chief Junior Marshal for the senior graduation because she had the highest grade point average in the junior class. (¶¶ 50, 53.) As a junior marshal, L.B. was required to attend certain events preceding graduation. (¶ 53; Am. Compl. Ex. 3 (DE 10-3).[1])

According to a statement L.B. provided to school staff, L.B. and another student "had jokingly made plans about having sex" prior to the trip. (Am. Compl. Ex. 5 (DE 10-5).[2]) While on the trip on May 12 and as the students "were returning to the hotel from restaurants," the same student "asked [L.B.] if [she] was going to have sex with him that night. [She] asked him if he had a condom, he said no, so [she] said absolutely not." (*Id.*) According to L.B., that student then asked for and received a condom from another student. (*Id.*)

---

[1] Although Plaintiffs have removed from the SAC all of the exhibits that were included in their Complaint and Amended Complaint, the Court may still consider these exhibits because their contents are referred to in the SAC and are central to Plaintiffs' claims. *See N.C. Motorcoach Ass'n v. Guilford Cty. Bd. of Educ.*, 315 F. Supp. 2d 784, n. 2 (M.D.N.C. 2004). In the case of Exhibit 3 to the Amended Complaint, this exhibit pertains to the required activities for Junior Marshals from which the Plaintiffs quote in the SAC (¶ 53), and these requirements are central to L.B.'s allegation that the revocation of her title as Chief Junior Marshal was discriminatory.

[2] *See supra* note 1. Although L.B.'s statement (Am. Compl. Ex. 5) is now removed from the SAC, Plaintiffs characterize L.B.'s statement in the SAC and rely on the content of her statement in alleging the discipline was in error and that discipline investigation was insufficient. *See* SAC ¶¶100-101, 116. Because of Plaintiffs' reliance on the contents of L.B.'s statements, the Board may consider the statement in resolving the motion to dismiss.

The Board employee chaperones[3] on the field trip had "orally informed students that they intended to check the students' rooms at 10:30 p.m." (¶ 66.) Although the chaperones did not conduct a room check on the evening of May 12, "[L.B.] waited for this time to pass," (Am. Comp. Ex. 5 (DE 10-5)), and at approximately 10:45 p.m., L.B. left her motel room to check on two male students, D.M. and T.W. (¶ 67.) In the boys' hotel room, there were five students drinking alcohol, including D.M., T.W., and B.O., and L.B. saw D.W. and B.O. go into the bathroom with marijuana. (*Id.*) After about an hour, two students left the hotel room, but L.B. remained in the room with the other three male students, D.M., T.W., and B.O. (¶ 68.)

When L.B. later described this conduct to school administrators, she stated that one of the male students "was getting touchy" with L.B. and she "was okay with this." (Am. Compl. Ex. 5 (DE 10-5).) According to L.B., this made two of the other students who were in the room "uncomfortable" and they left the room, but L.B. remained in the hotel room with D.M., T.W., and B.O. (*Id.*) Around midnight, L.B. alleges that she laid on the bed to go to sleep. (¶ 70) L.B. then alleges that D.M. and B.O. initiated sexual intercourse with her. (¶ 74) T.W. allegedly recorded the sexual encounter on his phone, distributed it, and then climbed onto the bed with L.B., D.M., and B.O., saying "I'm next." (¶¶ 76-77) Afterward, L.B. returned to her hotel room. (¶ 78) Despite the SAC's allegations that L.B. said "no" and resisted during the sexual encounter (¶¶ 72-75), the SAC does not allege that L.B. or K.B. reported to the Board, Superintendent Farrelly, or any other defendant at any point that L.B. was subject to unwelcome contact from D.M., B.O., or T.W. Rather, Plaintiffs' later statements to staff indicated that the conduct was consensual. (Am. Compl. Exs. 5, 9, 17.[4])

The next day, Principal Harris and Assistant Principal Strothers came to the hotel to investigate rumors of underage drinking. (¶ 81) Principal Harris removed D.M. and B.O. from the field trip and

---

[3] These chaperones, Alaina Ritter, Alyssa Parrish-Stafford, Dara Harmon, and Miles Stafford, have also been named as individual defendants.

[4] *See supra* note 1. The SAC (¶¶ 152, 154, 155, 158) summarizes the contents of and quotes from K.B.'s grievance which was submitted as Am. Compl. Ex. 17. The Superintendent's grievance decision, which was submitted as Am. Compl. Ex. 9, is also summarized in the SAC (¶ 175). These documents, along with L.B.'s statement (Am. Compl. Ex. 5), are central to Plaintiffs' allegations that K.B. engaged in protected activity under Title IX and the Whistleblower Act and that Plaintiffs were denied equal protection.

"suspended these students for ten (10) days for violating the school rule prohibiting the possession of alcohol on a school-sponsored trip." (¶ 82) During the remainder of the trip, the chaperones performed room checks, but the masking tape placed on the doors overnight would begin to peel away by the morning. (¶ 83) Plaintiffs further allege that the students "were not supervised at all times during the field trip." (¶¶ 60, 65, 80).

On May 17, after the students had returned from the trip, school staff "questioned Plaintiff L.B. about rumors that L.B. was involved in sexual activity on the field trip and that L.B. was in Snapchat videos involving sexual activity," and L.B. admitted to being in the motel room with the boys, but she denied the allegations of sexual activity. (¶ 88) On May 18, L.B. "voluntarily returned" to the counselor's office "because she was upset about the rumors of an alleged video and concerned that her mother, Plaintiff K.B., had also heard the rumors." (¶ 91) During this visit, L.B. admitted to the counselor and Principal Harris that she engaged in sexual activity during the trip. (¶ 96) Afterward, Principal Harris "ordered Plaintiff L.B. to write a statement," but Plaintiffs allege that the male students involved were not ordered to write statements. (¶¶ 98, 100) Plaintiffs allege that L.B. "tr[ied] to protect the inebriated students" in her written statement and that this statement was used as "the sole basis of her suspension." (¶¶ 100, 101) Indeed, absent from the SAC are any allegations that Plaintiffs reported unwelcome sexual contact to school staff or administrators at any point during the investigation of the sexual activity rumors. (¶¶ 88-99) L.B. alleges that she was unaware that she was being investigated for any potential misconduct. (¶ 100)

On May 19, L.B. was called to the office by Principal Harris "to discuss her written statement" in the presence of Assistant Superintendent Marc Whichard and was asked questions "regarding the alcohol and drugs in the room and [to] verify T.W.'s involvement in the sexual activity." (¶¶ 104, 106) L.B. alleges that during this meeting she was still unaware that she was being investigated for a potential violation of the Code of Conduct. (¶ 105) Principal Harris contacted K.B., notified her L.B. may receive a long-term suspension, and asked her to come to Southwest as soon as possible. (¶¶ 112-113) When K.B. arrived, he notified her that he was suspending L.B. for ten (10) days, which is a short-term

4

suspension, and provided her with a discipline referral and notice. (¶ 113) L.B.'s suspension was for "Sexual Harassment." (¶ 115; Am. Compl. Exs. 6, 7, 8 at 1[5]) During a suspension, "students are not to attend athletic events or participate in any extracurricular activity." (Am. Compl. Ex. 8 at 1 (DE 10-8)) Because she was suspended, L.B. was not able to attend the required Senior Awards Ceremony on May 19 and could not continue to serve as Chief Junior Marshal as a result of her missed attendance. (¶ 127)

Although Plaintiffs remove the allegation from the SAC that "Defendant Board gave T.W. the same ten-day suspension for 'sexual harassment,'" (Am. Compl. ¶ 118), the SAC continues to lack any allegations that T.W. was not suspended, was cited for a different offense, or otherwise received a different length of suspension than L.B. Rather, the allegation is that T.W. was "not punished to the same extent" as L.B. (¶ 195.) Despite this, the SAC does not contain any allegations that T.W., B.O., or D.M. were allowed to participate in extracurricular or athletic activities during their suspensions.

After leaving Southwest on May 19, K.B. went to the central office and spoke with Assistant Superintendent Whichard. (¶ 133) She alleges that Mr. Whichard "refused to modify the disciplinary decision or the language of the referral," agreed with Principal Harris's manner of investigation, and assured her that L.B.'s Governor's School nomination would not be affected by the suspension. (¶¶ 135, 143) During this conversation, she alleges Mr. Whichard "maliciously stated[6] that Plaintiff L.B. left her room specifically for the purpose of having sex." (¶ 144) The SAC further alleges that Mr. Whichard told her that another employee was not available that day to meet with K.B., and K.B. alleges this experience "intimidated [her] so much that she left the building and went straight to an urgent care center where she presented with extremely high blood pressure." (¶ 145)

Although the SAC alleges K.B. was prevented from timely obtaining copies of Board policies in order to "file a grievance of the discriminatory treatment of her daughter," K.B. did submit such an appeal

---

[5] *See supra* note 1. Because the Code of Conduct's definition of "Sexual Harassment" is integral to the allegations in the SAC that L.B.'s discipline was in violation of Title IX and section 1983, it is appropriate for the Court to consider the suspension notice, Code of Conduct, and Board Policy 4315, which is incorporated by reference in the Code of Conduct. (*See* SAC ¶¶ 120-121, 232, 250) The documents were submitted as Exhibits 6, 7, and 8 to the Amended Complaint and are continue to be quoted in part in the SAC (¶¶117-118).
[6] Although Plaintiffs alleged in their Complaint and Amended Complaint that Mr. Whichard "implied" such a motive (Am. Compl. ¶ 83), Plaintiffs now allege that Mr. Whichard maliciously stated this motive.

5

on May 26. (¶¶ 146, 152) Her grievance contested the application of the Code of Conduct to L.B.'s behavior, argued a different offense was applicable, disagreed with the length of L.B.'s suspension, complained of the effect the suspension had on L.B.'s ability to serve as Chief Junior Marshal, and complained of the supervision on the field trip. (Am. Compl. Ex. 17 (DE 10-17).) Absent from the grievance was any allegation that L.B. had been treated differently because of her sex or that she had experienced any unwelcome contact from the three male students. (*Id.*) On an unspecified date, K.B. alleges that she "orally filed a report with the Defendant Principal of the discrimination against her daughter, L.B., and the concerns that K.B. had regarding the biased investigation and the undocumented facts on which the discriminatory discipline and ongoing punishment was based." (¶ 148)

On June 1, K.B. attended a grievance conference with Superintendent Farrelly and alleged he "intimated" that K.B. did not know how to file a grievance and that she did not want to do her job as a teacher. (¶ 161) After the grievance, L.B. alleges Superintendent Farrelly "began making an unprecedented number of visits" to the school where she worked and that during these visits he "would walk down the hall" where her "classroom is located, stop outside her classroom, look inside, and then continue walking" which had the effect of intimidating her. (¶¶ 173, 174) On June 6, Superintendent Farrelly denied K.B.'s grievance. (¶ 175) Also on June 6, L.B.'s nomination for Governor's School was rescinded. (¶ 176) On June 10, K.B. appealed the Superintendent's decision regarding her grievance to the Board. (¶ 181) The sole focus of the written appeal was that L.B. be permitted to participate in graduation as the Chief Junior Marshal. (Am. Compl. Ex. 12 (DE 10-12)[7]) After holding a hearing on June 16, the Board denied K.B.'s appeal on June 27. (¶¶ 183, 191; Am. Compl. Ex. 15 (DE 10-15)[8]) During the appeal process, Superintendent Farrelly and the Board acknowledged that K.B. "raised valid concerns about adult supervision" but concluded L.B. ultimately violated the Code of Conduct and that her consequence was appropriate. (¶ 193)

---

[7] *See supra* note 1. Because the SAC characterizes the contents of K.B.'s appeal as a complaint of sexual harassment (¶184), the document itself may be considered by the Court in resolving whether the SAC sufficiently alleges such a claim.

[8] *See supra* note 1. Because the SAC characterizes the contents of the Board's appeal decision (¶¶ 192-194), the document itself may be considered by the Court.

The SAC includes other complaints regarding the allegedly deficient investigation and appeal involving L.B.'s conduct on the field trip. While Plaintiffs have neither alleged that they reported to Principal Harris that L.B. was subject to unwelcome conduct nor that they reported a sexual offense or sexual assault, they allege Principal Harris failed to "notify local enforcement to investigate the sexual interactions described by Plaintiff L.B." (¶ 123) Plaintiffs also allege they experienced "grave emotional distress, overwhelming anxiety, and depression" and that on June 7, K.B. contacted a mobile crisis unit for L.B. as a result of the events. (¶¶ 178-179)

The SAC also contains allegations pertaining to the following school year, 2016-2017. Plaintiffs contend that L.B. was no longer a member of the Leadership Academy nor permitted to participate in the National Honor Society or the Tutoring Tactics Community Outreach Program, and they allege the male students were allowed to participate in all of their activities when they returned for their senior year. (¶ 201-205) Plaintiffs allege that in October 2016 K.B. contacted Principal Harris that L.B. has "been harassed this year by one of the members related to last years [sic] event." (¶ 208) K.B. further alleged that Principal Harris responded by encouraging L.B. to meet with him or the counselor. The SAC lacks any allegation that L.B. met with Principal Harris or the counselor. (¶ 210)

After filing this lawsuit, Plaintiffs also allege that K.B.'s supervisor, Principal Castillo, "informed" K.B. that "[K.B.] had fallen from 'Accomplished' to 'Proficient' in her performance." (¶ 212) K.B. alleges she was "threatened" with an Action Plan but that such a plan was not imposed. (¶ 213-214) K.B. also alleges that on November 30 Principal Castillo questioned her "using inappropriate language" when the word "faggot" was discussed in K.B.'s class. (¶ 215) K.B. alleges she received a reprimand on December 12, 2016 for unprofessional behavior. (¶ 218) K.B. alleges another student made a complaint about her and Principal Castillo met with her about this complaint on December 14. (¶ 219) K.B. alleges she was suspended with pay on January 12, 2017, placed on extended sick leave beginning January 24, and that she resigned on March 31, 2017. (¶ 222, 226-227)

## STANDARD OF REVIEW

I.  **Motion to Dismiss Under Rule 12(b)(6)**

7

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, viewing the complaint in a light most favorable to the plaintiff. *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "[T]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements," however, cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The plaintiff bears "the burden … to allege facts sufficient to state all the elements of her claim." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). "While a plaintiff is not charged with pleading facts sufficient to prove her case, as an evidentiary matter, in her complaint, a plaintiff is required to allege facts that support a claim for relief." *Id.* Facts not alleged in the complaint should not be assumed by the reviewing court. *Estate Const. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 221-22 (4th Cir. 1994).

However, the court "may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citing Fed. R. Civ. P. 10(c)). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached [to the complaint,] ... the exhibit prevails." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (quoting *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991).

The court need not accept legal conclusions a plaintiff draws from the facts asserted; likewise, the reviewing court "need not accept as true unwarranted interferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Associates Ltd. Partnership*, 213 F.3d 175, 180 (4th Cir. 2000). Accordingly, a plaintiff's bald assertions that a defendant violated the law are insufficient to survive a motion to dismiss under Rule 12(b)(6). *Estate Const. Co.*, 14 F.3d at 221.

## II.  Motion to Dismiss Under Rule 12(b)(1) and 12(b)(2)

It is well-established in North Carolina that issues of sovereign immunity and governmental immunity are jurisdictional. *See, e.g.*, *Seipp v. Wake Cnty. Bd. of Educ.*, 132 N.C. App. 119, 122, 510

S.E.2d 193, 195 (1999) (stating that the court considered the issue of sovereign immunity in an interlocutory appeal because it is a matter of personal jurisdiction); *Welch Contracting, Inc. v. N.C. Dept. of Transp.,* 175 N.C. App. 45, 50, 622 S.E. 2d 691, 694 (2005) (stating that the defense of sovereign immunity is a jurisdiction defense). To resolve a jurisdictional defense of immunity raised under Rule 12(b)(1) or 12 (b)(2), the court may consider matters outside the pleadings, including affidavits, without converting the motion to dismiss into a motion for summary judgment. *See Smith v. Privette*, 128 N.C. App. 490, 493, 495 S.E.2d 395, 397 (1998); *Irving v. Charlotte-Mecklenburg Bd. of Educ.*, 2013 WL 5508370, at *2 (N.C. Ct. App. Oct. 1, 2013) (table) (unpublished). In order to exercise jurisdiction, "a plaintiff's complaint must affirmatively demonstrate the basis for the waiver of immunity when suing a governmental entity which has immunity." *Arrington v. Martinez*, 215 N.C. App. 252, 263, 716 S.E.2d 410, 417 (2011).

In support of its jurisdictional defense of sovereign immunity, the Board incorporates by reference the previously filed affidavits of North Carolina School Boards Trust ("NCSBT" or "Trust") Records Custodian Melody Coons and of Edgecombe County Board of Education Finance Officer Laurie Leary. (DE 37-1, 37-2) Ms. Coons's affidavit states that the Board participates in the Trust and attaches a true and correct copy of the Board's coverage agreement with the Trust ("Coverage Agreement"). (DE 37-1) Ms. Leary's affidavit states that the Board has not purchased or otherwise secured any liability insurance coverage or risk protection for claims other than that which it has by virtue of its participation in the Trust. (DE 37-2)

## ARGUMENT

**I.      Plaintiffs' claims for erroneous outcome discrimination and selective enforcement under Title IX in Counts I and II must be dismissed because Plaintiffs have failed to state a cause of action upon which relief may be granted.**

To establish institutional liability for erroneous outcome discrimination under Title IX, a plaintiff must allege: "(1) 'a procedurally or otherwise flawed proceeding'; (2) 'that has led to an adverse and erroneous outcome'; and (3) 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 765-66 (D. Md. 2015)

(citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)); *see also Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 961–62 (4th Cir.1997) (relying on *Yusuf* when analyzing an erroneous outcome claim), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir.1999). For this third element, "a plaintiff must do more than merely rely on 'a conclusory allegation of gender discrimination.'" *Salisbury Univ.*, 123 F. Supp. 3d at 766. Rather, "[i]n order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of [ ] discriminatory intent." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994); *see also Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015) ("A plaintiff seeking relief under this standard must allege facts which establish a causal link between the erroneous outcome and gender bias.").

Here, Plaintiffs fail to allege facts supporting any elements of the *prima facie* case for erroneous outcome discrimination. First, Plaintiffs have failed to identify a disciplinary proceeding, much less allege circumstances that would show a flawed disciplinary proceeding. Absent from the SAC is any allegation that L.B. was subject to a disciplinary proceeding resulting from a Title IX grievance or that any such Title IX complaint was filed against L.B. *Cf. Plummer v. University of Houston*, 860 F.3d 767, 770 (5th Cir. 2017) (considering Title IX discipline claims where "student submitted a complaint to the University alleging that she was a victim of sexual assault"); *Brzonkala*, 132 F.3d at 953-56 (pertaining to an incident where plaintiff filed a complaint pursuant to the university's sexual assault policy and alleged that the disciplinary proceedings resulting from the complaint were flawed); *Yusuf*, 35 F.3d at 712 (pertaining to an incident where another student had filed sexual harassment charges against plaintiff and the discipline complained of resulted from the disciplinary proceeding held for the sexual harassment charge); *Doe v. Univ. of the South*, 687 F. Supp. 2d, 744, 751 (E.D. Tenn. 2009) (pertaining to a proceeding where a student had accused plaintiff of sexual assault and plaintiff challenged the outcome of the resulting disciplinary proceeding); *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 191-200 (W.D.N.Y. 2013) (same). Because there is no associated formal proceeding for a short-term suspension,

*see* N.C. Gen. Stat. § 115C-390.6, such decision cannot serve as the basis for an erroneous outcome or selective enforcement Title IX disciplinary proceeding claim.

Even if L.B.'s short-term suspension could be a predicate proceeding, a principal has the authority "to impose a short-term suspension on a student who willfully engages in conduct that violates a provision of the Code of Conduct authorizing short-term suspension." N.C. Gen. Stat. §115C-390.5. A short-term suspension may be imposed after providing "oral or written notice" of the charge and basis for the accusations, "an informal hearing with the principal," and an opportunity for the student "to make statements in defense or mitigation of the charges." N.C. Gen. Stat. §115C-390.6. Plaintiffs have not alleged facts that would show Principal Harris failed to provide L.B. due process prior to imposing the suspension or otherwise conducted a flawed proceeding for the short-term suspension. To the contrary, Plaintiffs' allegations if proven would show that prior to L.B.'s suspension: L.B. was asked on two occasions about the sexual activity, L.B. admitted to engaging in sexual activity, she was provided the opportunity to write a statement, she was asked questions about the written statement, K.B. was provided with written notice of the suspension, and K.B. was permitted to seek review of the decision through the grievance process. (¶¶ 88, 91, 96, 101) The SAC is devoid of allegations that if proven would show L.B. was denied an opportunity to respond to the alleged misconduct or was otherwise subjected to a flawed proceeding. *See Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601 (S.D. Ohio 2016) (finding plaintiff failed to allege a flawed disciplinary proceeding where there were no allegations that plaintiff had been denied the opportunity to present evidence at the disciplinary hearing).

Second, Plaintiffs have not alleged facts showing an erroneous outcome. The essence of Plaintiffs' erroneous outcome allegation is that there is no evidence L.B. engaged in offensive or unwanted touching. (*See* ¶ 235.) However, the Code of Conduct's sexual harassment definition specifically incorporates all of Policy 4315, which prohibits, *inter alia*: "behavior that is immoral, indecent, lewd, disreputable or of an overly sexual nature in the school setting." (Am. Compl., Ex. 7, 8 (DE 10-7, 10-8)) In other words, while "Sexual Harassment" in the Code of Conduct prohibits offensive or unwanted touching, the offense is not limited to only offensive or unwanted conduct. Moreover, the

Code explicitly applies to "school-approved activities" such as the History Club field trip. (Am. Compl. Ex. 8 ([DE 10-8](#))) The allegations in the SAC if proven would show that L.B. engaged in conduct of an "overly sexual nature" by having consensual sexual intercourse with two students and engaging in consensual sexual contact with a third student during a school field trip. (Am. Compl., Ex. 5 at 1-2 ([DE 10-5](#)), Ex. 17 at 8 ([DE 10-17](#))) While Plaintiffs disagree that this conduct should be categorized as "sexual harassment" under the Code of Conduct, L.B.'s alleged conduct still falls within the scope of "sexual harassment" as it has been defined in the Code. *See Doe v. W. New England Univ.*, No. CV 15-30192-MAP, 2017 WL 113059, at *21 (D. Mass. Jan. 11, 2017) (dismissing an erroneous outcome claim under Title IX where "there was an evidentiary basis for the [disciplinary board's] decision. Plaintiff's disagreement with that decision does not constitute a claim upon which relief can be granted due to the absence of 'basic fairness.'").[9]

Third, the SAC lacks any allegation of statements or conduct by Principal Harris or other staff involved in the suspension that would tend to show gender bias or that they were influenced in the decision by L.B.'s gender, which is a necessary element for an erroneous outcome claim. The SAC contains only conclusory allegations that the investigation was "cursory, biased, and intentionally incomplete." (¶ 235) The sole specific allegation of L.B.'s supposed different treatment from male students in the disciplinary process is that Defendants "did not order any of the males involved in the incident to write a statement or otherwise conduct any investigation into their involvement." (¶ 98) However, absent from the SAC are any allegations that would give rise to a plausible claim that the Board systemically treated female students differently in the discipline investigation process or a causal connection to the outcome of the discipline proceeding. *Cf. Yusuf*, 35 F.3d 709. *See also Doe v. Cummins*, 662 Fed. App'x 437, 453 (6th Cir. 2016) (dismissing claim where plaintiffs "fail[ed] to show

---

[9] The SAC also alleges that the Board failed to train staff regarding how to investigate potential student-on-student harassment and that this alleged deliberate indifference led to an erroneous outcome. However, the deliberate indifference standard is inapplicable when analyzing an erroneous outcome claim, *see Mallory v. Ohio Univ.*, 76 Fed. App'x 634, 638 (6th Cir. 2003), and allegations of improper training in an erroneous outcome claim must be accompanied by facts sufficient to conclude the educational institution's conduct was motivated by gender bias. *See Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016).

how these alleged procedural deficiencies [regarding due process violations] are connected to gender bias"); *Doe v. Western New England Univ.*, 228 F.Supp.3d 154, 188 (D. Mass. 2017)(dismissing claim because allegations that an administrator "bull[ied]" and "yelled" at a student during a disciplinary interview did "not raise a reasonable inference of gender bias"); *Univ. of Cincinnati*, 173 F. Supp. 3d at 607 (holding "the complaint fails to create a reasonable inference that the disciplinary hearing procedures adopted by [defendant] were motivated by a desire to discriminate against male students.").

Plaintiffs' selective enforcement claim under Title IX fails for the same reason as the erroneous outcome claim, namely the SAC does not allege facts that would show L.B. has been treated differently because of her sex. For a selective enforcement claim, a plaintiff must allege facts that show "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. Like an erroneous outcome claim, the complaint must also allege facts that would support a conclusion that "gender is a motivating factor in the decision to discipline." *Id.* Because the SAC fails to allege facts that would support a conclusion that the discipline of L.B. was motivated by gender bias, L.B.'s selective enforcement claim must also be dismissed. *See Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 7254213, at *7 (S.D. Ohio Nov. 17, 2015) (dismissing selective enforcement claim where male plaintiff failed to "allege that members of the hearing panel or university officials made statements indicating gender bias against men" or that the university had a pattern and practice of imposing harsher penalties against men).

## II. Plaintiffs' claims for retaliation in violation of Title IX in Count III must be dismissed because Plaintiffs have failed to state a claim.

The Supreme Court has recognized that Title IX's private cause of action encompasses "[r]etaliation against a person because that person has complained of sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). To state a claim for retaliation, a plaintiff must show (1) she engaged in protected activity; (2) that defendant took a material adverse action; and (3) that a causal connection existed between the protected activity and the adverse action. *See Emeldi v. Univ. of Oregon*, 698 F.3d 715, 732-33 (9th Cir. 2012); *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)

13

(applying a similar standard for the *prima facie* case for retaliation in the Title VI context). "Where the retaliation occurs *because the complainant speaks out about sex discrimination*, the 'on the basis of sex' requirement is satisfied." *Jackson*, 544 U.S. at 179 (emphasis added).

The SAC fails to state a claim for retaliation because Plaintiffs have not alleged facts showing a plausible causal connection between any protected activity and alleged adverse action. First, K.B.'s written grievance does not include any allegations that L.B. was treated differently because of her sex. (Am. Compl. Ex. 17, DE 10-17) Rather, her grievance contests the application of the Code of Conduct, L.B.'s suspension, the effect her suspension had on L.B.'s ability to serve as Chief Junior Marshal, and the supervision on the field trip. (*Id.*) While the grievance complains of general unfairness, the allegation lacks any connection to L.B.'s gender and is instead based on general allegations of "favoritism, ignoring less popular students, and talking and interacting with certain groups of students over others." (*Id.* at 3) K.B. further states in her grievance that L.B. and the three male students were all treated unfairly: "I conclude that she and the other students were victims of failed supervision and neglect." (Id. at 5) Second, K.B.'s alleged oral reports to the Principal pertain to complaints about discipline, not sex discrimination. K.B. alleges that at some point prior to submitting her formal grievance she "orally filed a report" to Principal regarding "discrimination" and "discriminatory discipline." (¶ 148) However, she does not allege that the basis for this report was that L.B. had been treated differently from the male students, and as the contents of her written grievance indicate, she was complaining about generalized unfairness. Regardless, even if K.B. made an "oral report" to the Principal, she has not alleged any facts supporting a plausible conclusion that the Board or Superintendent were aware of such activity when making decisions regarding L.B.'s Governor's School attendance or Chief Marshal status, as would be necessary to support a plausible causal connection. Third, the first alleged complaint that L.B. was "not guilty of sexual harassment, and instead, was a victim" occurred at the Board hearing. (¶ 184) To the extent this statement is protected activity, the allegations in the SAC would show that L.B.'s suspension and removal as graduation marshal occurred *before* this alleged report.

14

Regarding the alleged adverse action taken against K.B. by Principal Castillo, the SAC fails to allege facts showing a plausible causal connection. K.B. has not alleged that Principal Castillo had any notice of K.B.'s alleged complaints on behalf of L.B. or of her lawsuit. As a result, K.B.'s retaliation claims must also be dismissed.

### III. Plaintiffs' claims for violation of § 1983 in Count V [sic] fail to state a claim on either Equal Protection and Procedural Due Process grounds.

#### A. Plaintiffs fail to state an equal protection claim because they have not alleged facts that would show the Board had a policy or custom that caused the alleged injury at issue.

To state an equal protection claim under the Fourteenth Amendment, a plaintiff must allege "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). In order to hold a local government body liable for such an injury under section 1983, the government body itself must have caused the constitutional violation at issue. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). This occurs when the "execution of [the board's] policy or custom . . . inflicts the injury." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982). A plaintiff must be able not only to point to such a policy or custom, but to demonstrate that the policy was the "moving force" behind the plaintiff's injury. *Board of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Here, Plaintiffs fail to allege facts supporting a plausible claim that there was a "policy or custom" that inflicted L.B.'s alleged injury. Rather, Plaintiffs' claim rests on the following alleged oversights of the Board: "failing to publish the name of the Title IX Coordinator"; "refusing to timely provide Plaintiff K.B. a copy of the policy outlining the rights of the victim and accused"; failing to inform Plaintiffs of the Title IX coordinator; failing to ensure the Title IX coordinator carried out his responsibilities; failing to adopt a grievance procedure; failing to conduct an investigation; failing to provide written notice of investigation findings; failing to prevent the recurrence of harassment; and failing to train employees. (¶ 267) None of these allegations support a plausible claim that the Board has "a formal 'policy statement' of ignoring or condoning sexual harassment or abuse of students that was

15

'officially adopted and promulgated' by the Board. *Brittany B. v. Martinez*, 494 F. Supp. 2d 534, 541-42 (W.D. Tex. 2007). Moreover, Plaintiffs have previously submitted to the Court the Board's promulgated policy against sexual harassment that was in effect at the time of the SAC's allegations and which addresses training, the identity of the Title IX Coordinator, and identifies the grievance procedure for such complaints. (Am. Compl. Ex. 19 (DE 10-19))

Plaintiffs also fail to allege facts supporting any "custom" of ignoring sexual harassment. While the SAC alleges that the Board had a custom of wrongfully "punishing students for 'Sexual Harassment' for engaging in behavior listed in the 'Disruptive Behavior' policy," the SAC does not allege that the Board had actual or constructive knowledge of such conduct. *See Brittany B.*, 494 F. Supp. 2d at 542. At most, the SAC alleges that L.B. was wrongfully punished, but one incident cannot support a plausible claim for a custom. *See Doe v. New Philadelphia Pub. Sch. Bd. of Educ.*, 996 F. Supp. 741, 747 (N.D. Ohio 1998) ("[T]wo incidents of neglectful conduct on the part of two New Philadelphia officials are troubling, but they do not rise to the level of a custom within the district, and certainly do not implicate the School Board in any way.") Because the SAC lacks allegations to support a policy or custom of ignoring sexual harassment by the Board, Plaintiffs' equal protection claim against the Board must be dismissed.

> B. *Plaintiffs fail to state a claim for a procedural due process violation because they have not alleged facts showing a deprivation of a protected property interest without adequate review.*

"In order to state a claim for a violation of due process, 'a plaintiff must allege sufficient facts to support a finding that the [plaintiff was] 'deprived of life, liberty, or property, by governmental action.'" *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 79 (4th Cir. 2016) (quoting *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011)). To have a property interest in a certain government benefit, "'a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996)). When considering whether a plaintiff has a property interest, the Fourth Circuit has considered whether

the interest at issue is secured by state law. *See Knight v. Vernon*, 214 F.3d 544, 553 (4th Cir. 2000) (examining state law to determine whether jailer had protected property interest in continued employment and concluding that she did not). Where there is a protected property interest, the interest "cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The amount of process required to be adequate depends on the protected interest at issue, but "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).

Plaintiffs' procedural due process claim fails because L.B. was provided the due process required prior to her short-term suspension. Prior to being suspended from school, a student "must be given some kind of notice and afforded some kind of hearing." *Goss v. Lopez*, 419 U.S. 565 (1975). For a short-term suspension, this means "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. Here, prior to L.B.'s suspension, she was provided an opportunity to respond to the alleged misconduct that met *Goss*'s minimum requirements: she was asked on two occasions about the sexual activity, she admitted to engaging in sexual activity, she was provided the opportunity to write a statement, she was asked questions about the written statement, and K.B. was provided with written notice of the suspension. (¶¶ 88, 91, 96, 101, 113). *See E.W. v. Wake Cnty. Bd. of Educ.*, No. 5:09-CV-198-FL, 2010 WL 1286218, at *3 (E.D.N.C. Mar. 30, 2010) (finding allegation that school officials called parent to notify them of fight and asked student for his version of events met rudimentary requirements of *Goss*, and rejecting plaintiff's argument that more specific notice was required before student was suspended for "assault").

Plaintiffs' main complaint is that they believe the Code of Conduct was inappropriately applied; however, even an alleged misinterpretation of the Code of Conduct is not sufficient to state a claim for a due process violation. *See, e.g.*, *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 570 (6th Cir. 2011) ("School officials' alleged acts during [plaintiff's] appeals of his suspension did not implicate and could not violate [plaintiff's] right to procedural due process even if contrary to school policies and procedures

17

or [state] law."); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 603 (S.D. Ohio 2016) (holding plaintiff's "bare allegations that the [disciplinary] Panel misinterpreted the Student Code of Conduct are insufficient to state a due process violation"). Because the SAC contains factual allegations that L.B. was provided notice and an opportunity to respond prior to her suspension, her procedural due process claim regarding her punishment must be dismissed.

In addition, Plaintiffs' procedural due process claim related to the rescission of her Governor's School admission fails because she had no protected property interest in such admission. "The opportunity to participate in extracurricular activities is not, by and in itself, a property interest." *Pegram v. Nelson*, 469 F. Supp. 1134, 1139 (M.D.N.C. 1979) (noting "this Court is unaware of any North Carolina statute or law which creates a right to participate in extracurricular activities."). Although the SAC adds a new aspect to this claim regarding a supposed "liberty interest in reputation" (¶ 268), "the interest in reputation . . . is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." *Paul v. Davis*, 424 U.S. 693, 712 (1976). *See also Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). Because these opportunities and issues are not protected property interests, L.B.'s claim for deprivation of procedural due process fails. *Pegram*, 469 F. Supp. at 1140 (holding "denial of the opportunity to participate in merely one or several extracurricular activities would not give rise to a right to due process"); *Fowler v. Williamson*, 448 F. Supp. 497, 502 (W.D.N.C. 1978) (holding no protected property interest in attending graduation ceremony).

**IV.     Plaintiff K.B.'s claims for violation of the Whistleblower Act in Count VI [sic] must be dismissed for failure to state a claim.**

The North Carolina Whistleblower Act offers protection for state employees and other employees of certain local governments. N.C. Gen. Stat. § 126–84. To state a claim under the North Carolina Whistleblower Act, a plaintiff must allege: "(1) that the plaintiff engaged in a protected activity, (2) that the defendant took adverse action against the plaintiff in his or her employment, and (3) that there is a causal connection between the protected activity and the adverse action taken against the plaintiff." *Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 788, 618 S.E.2d 201, 206 (2005).

However, North Carolina courts have "decline[d] to extend the definition of a protected activity to individual employment actions that do not implicate broader matters of public concern," noting "[w]e do not believe the General Assembly intended N.C. Gen. Stat. § 126-84 to protect a State employee's right to institute a civil action concerning employee grievance matters." *Hodge v. N. Carolina Dep't of Transp.*, 175 N.C. App. 110, 117, 622 S.E.2d 702, 707 (2005). *See also Manickavasagar v. N.C. Dep't of Pub. Safety*, 238 N.C. App. 418, 428, 767 S.E.2d 652, 658 (2014) (holding employee's letter "constituted an employee grievance matter, which was not protected by the Act").

Here, Plaintiff K.B.'s Whistleblower claim fails because she has failed to allege she engaged in protected activity that "implicate[s] broader matters of public concern." Rather, the actions at issue are her alleged oral reports and written grievance pertaining to her complaint that her daughter's discipline was improper. (Am. Compl. Ex. 17, 18 (DE 10-17, 10-18)) In the same way that an employee grievance is not protected activity under the Whistleblower Act, a parent grievance is not protected activity that implicates broader matters of public concern—finding otherwise would create a scenario where employees who are parents may raise claims pursuant to the Whistleblower Act but non-employee parents would not be permitted to raise such claims. Because K.B. has failed to allege protected activity that is encompassed within the Whistleblower Act, this claim must be dismissed.

## V. Plaintiffs' tort claims against Defendant Board in Counts VII [sic], VIII [sic], IX [sic], X [sic], and XI [sic] should be dismissed because the Board has not waived its immunity to suit.

The doctrine of governmental immunity bars suits against "the state, its counties, and its public officials sued in their official capacity." *Herring v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 137 N.C. App. 680, 683, 529 S.E.2d 458, 461 (2000). "A county or city board of education is a governmental agency, and therefore may not be liable in a tort action except insofar as it has duly waived its [governmental] immunity from tort liability pursuant to statutory authority." *Overcash v. Statesville City Bd. of Educ.*, 83 N.C. App. 21, 22-23, 348 S.E.2d 524, 526 (1986); *see also Hallman v. Charlotte-Mecklenburg Bd. of Educ.*, 124 N.C. App. 435, 437, 477 S.E.2d 179, 180 (1996). N.C. Gen. Stat. § 115C-42 authorizes a local board of education to waive governmental immunity through the purchase of

19

liability insurance. "N.C. Gen. Stat. § 115C-42 is the *exclusive* means of a local board of education to waive immunity." *Ripellino v. N.C. Sch. Bds. Assoc.*, 158 N.C. App. 423, 428, 581 S.E.2d 88, 92 (2003) (citing *Lucas v. Swain Cnty. Bd. of Educ.*, 154 N.C. App. 357, 361, 573 S.E.2d 538, 541 (2002)) (emphasis added).

      A.      *The Board's participation in the Trust does not waive its immunity to tort claims.*

A board of education does not waive governmental immunity by participating in the North Carolina School Boards Trust ("NCSBT" or "the Trust"). *See, e.g., Barrett v. Board of Educ. of Johnston County*, 13 F. Supp. 3d 502, 508 (E.D.N.C. 2014); *Frye v. Brunswick County Bd. of Educ.*, 612 F. Supp. 2d 694, 703 (E.D.N.C. 2009); *Willett v. Chatham Cnty. Bd. of Educ.*, 176 N.C. App. 268, 269, 625 S.E.2d 900, 901-02 (2006); *Ripellino*, 158 N.C. App. at 428-29, 581 S.E.2d at 92-93; *Lucas*, 154 N.C. App. at 363, 573 S.E.2d at 542.

Here, the Board is immune from suit because it has not purchased liability insurance and therefore has not waived its immunity. Rather, the Board has elected to participate in the Trust, which does not meet the requirements necessary to waive immunity under N.C. Gen. Stat. § 115C-42. Indeed, the language of the Board's agreement with the Trust expressly states that:

> The NCSBT Coverage Agreement is *not* a contract of insurance by a company or corporation duly licensed and authorized to execute insurance contracts in this State or by a qualified insurer as determined by the Department of Insurance. Therefore, the NCSBT Coverage Agreement expressly is *not* considered a waiver of governmental immunity as provided in N.C.G.S. §115C-42.

(Def. Board's Mot. To Dismiss Second Am. Compl., Ex. 1 Attachment 1 at 1 (hereinafter "Coverage Agreement") (emphasis added) (DE 37-1)) Further, the Board's Finance Officer Laurie Leary has confirmed that the Board has not purchased or otherwise secured any liability insurance coverage or risk protection for claims other than that which it has obtained by virtue of its participation in the Trust. (Def. Board's Mot. To Dismiss Second Am. Compl., Ex. 2 (DE 37-2)) Therefore, the Board has not waived its immunity. *See Irving*, 2013 WL 5508370, at *1-2 (upholding trial court's grant of Rule 12(b)(1) and (b)(2) motion to dismiss negligence claims where supporting affidavit indicated that policy was not intended to waive school board's governmental immunity). Accordingly, the Board is immune from suit

in tort, and Plaintiffs' negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, defamation, and libel *per se* claims against the Board must be dismissed.

> B.      *The Board has not waived its immunity from Plaintiffs' claims through the Trust's excess insurance because there is no excess insurance for claims arising under the Sexual Acts and Abuse Liability Coverage.*

Even in circumstances where a board of education has waived its governmental immunity through the purchase of insurance or re-insurance, "such immunity is waived only to the extent that said board of education is indemnified by insurance for such negligence or tort." N.C. Gen. Stat. § 115C-42. Where there is no excess insurance for plaintiff's claim, a school board has not waived its governmental immunity for the claim. *See J.W. v. Johnston Cnty. Bd. of Educ.*, No. 5:11-CV-707-D, 2012 WL 4425439, *10 (E.D.N.C. Sept. 24, 2012).

Here, there is no excess insurance or re-insurance for Plaintiffs' claims. Plaintiffs' claims arise under the Sexual Acts and Abuse Liability Coverage, which applies to claims "alleging (1) negligent hiring, negligent supervision, negligent reporting, negligent investigation, negligent training and/or negligent retention of another person who is alleged to have engaged in sexual acts . . .  and/or (2) negligent acts or failure to act in response to notice of sexual acts . . ." (Coverage Agreement at 2-3.) Plaintiffs' allegations of "negligent investigation," "negligent supervision," and "negligent acts or failure to act in response to notice of sexual acts" plainly relate to the Sexual Acts and Abuse Liability coverage. (¶¶ 98, 123-124, 138, 149, 156, 158, 167)  However, as detailed in the Limits of Liability coverage chart, there is no excess insurance for Sexual Acts and Abuse Liability claims. (Coverage Agreement at 1-2.) Moreover, the Sexual Acts and Abuse Liability Coverage is also subject to the Exclusions in the Coverage Agreement, and these exclusions reiterate the unavailability of excess insurance for the claims raised by Plaintiffs. (Coverage Agreement, Exclusion 23.)

> C.      *Even if there were excess coverage available, the Board has not waived its immunity from Plaintiffs' claims because their claims are excluded under the Coverage Agreement.*

Furthermore, it is well-settled that governmental entities, such as local boards of education, retain governmental immunity to the extent that exclusions from coverage exist. *See, e.g., Patrick v. Wake*

*Cnty. Dept. of Soc. Servs.*, 188 N.C. App. 592, 655 S.E.2d 920 (2008); *Herring*, 137 N.C. App. at 688-89, 529 S.E.2d at 464; *Beatty v. Charlotte-Mecklenburg Bd. of Educ.*, 99 N.C. App. 753, 755, 394 S.E.2d 242, 244 (1990) ("unless the negligence or tort is covered by the insurance policy, sovereign immunity has not been waived by the Board or its agents"); *Overcash*, 83 N.C. App. at 23, 348 S.E.2d at 526. In such cases, courts strictly construe exclusionary clauses against waiver of immunity. *Herring*, 137 N.C. App. at 689, 529 S.E.2d at 464; *Overcash*, 83 N.C. App. at 25-26, 348 S.E.2d at 527; *Beatty*, 99 N.C. App. at 756, 394 S.E.2d at 244-45. Thus, if the plaintiff alleges claims excluded from coverage under the governmental entity's policy, there is no waiver of immunity. *Patrick*, 188 N.C. App. at 596, 655 S.E.2d at 923 ("A governmental entity does not waive sovereign immunity if the action brought against [it] is excluded from coverage under [its] insurance policy."); *Lyles v. City of Charlotte*, 344 N.C. 676, 682, 477 S.E.2d 150, 154 (1996). "In determining whether the provisions of a liability insurance policy provide coverage for a tort action, our courts apply the 'comparison test,' thereby requiring the policy provisions to be analyzed and compared with the allegations in the pleadings." *Herring*, 137 N.C. App. at 686, 529 S.E.2d 463 (citing *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 693, 340 S.E.2d 374, 378 (1986)).

      1.       *Because the Coverage Agreement excludes claims "in connection with" sexual misconduct, the Board has not waived its immunity to Plaintiffs' negligence claim in Counts VII [sic] of the SAC.*

Plaintiffs' claims for negligence against the Board are excluded under multiple other provisions of the Coverage Agreement and are not subject to excess insurance. Plaintiffs' underlying allegations for their negligence claim is that the Board's failure to supervise students resulted in "three (3) intoxicated male students coerc[ing] Plaintiff L.B. into undesired sexual activity," T.W. engaging in a criminal offense by distributing a video of the sexual activity, and that L.B. allegedly experienced emotional harm and medical issues as a result. (¶¶ 285, 287, 288, 297) Similarly, Plaintiffs allege that this sexual activity and harm also resulted from a failure to adequately supervise employees. (¶¶ 286, 296) Plaintiffs also allege a breach of "duty to report," "duty to investigate," duty to train, or otherwise properly respond to reports of the sexual activity. (¶¶ 289-295, 298, 299)

However, the Coverage Agreement excludes "any Claim, arising out of or in connection with, in whole or in part, sexual acts . . . sexual assault, or sexual misconduct of any kind" and "any Claim (other than a Personal Injury Claim), arising out of or in connection with, in whole or in part: . . . criminal acts." (Coverage Agreement at 7, 14, Exclusions 12, 23)  Moreover, there is no excess insurance for Sexual Acts and Abuse Liability Claims or for claims involving criminal acts.  (*Id.* at 1, 6)  In other cases involving the Trust's coverage, courts have concluded the sexual acts exclusion "precludes coverage for claims related to improper sexual misconduct" and that the Board at issue "[did] not have excess coverage" for such claims.  *See J.W.*, 2012 WL 4425439, at *12.  *See also Craig v. New Hanover Bd. of Educ.*, 185 N.C. App. 651, 654, 648 S.E.2d 923, 925 (2007), *rev'd on other grounds*, 363 N.C. 334, 335-36, 678 S.E.2d 351, 353 (2009) (holding that school board had not waived immunity under excess insurance policy containing an exclusion for "sexual acts, sexual molestation, sexual harassment, sexual assault or sexual misconduct of any kind"); *Frye v. Brunswick Cnty. Bd. of Educ.*, 612 F. Supp. 2d 694, 703 (E.D.N.C. 2009) (rejecting plaintiff's argument that excess insurance waived the board of education's immunity because "[t]he Agreement [between NCSBT and board of education] specifically excludes from its excess insurance 'any [c]laim arising out of or in connection with ... willful violation of any law [or] sexual acts, sexual molestation, sexual harassment, sexual assault, or sexual misconduct of any kind.'").

Because Plaintiffs have alleged the Board's negligence and negligent training/supervision resulted in both criminal and sexual activity, Plaintiffs' allegations against the Board fall within the Coverage Agreement's exclusions for claims "in connection with" "sexual assault, or sexual misconduct" and "criminal acts."  As a result, the Board has not waived its immunity from claims connected with such alleged acts.

        2.    *Because the Coverage Agreement excludes NIED and IIED claims, the Board has not waived its immunity to such claims raised in Counts VIII and IX of the SAC.*

Plaintiffs also attempt to assert claims for negligent infliction of emotional distress and intentional infliction of emotional distress against the Board, alleging the Board's "negligence was a proximate cause of Plaintiff L.B.'s severe emotional distress" and that the Board "engaged in extreme and

outrageous conduct," was "recklessly indifferent to the likelihood it would cause severe emotional distress to Plaintiff L.B and K.B.," and "in fact caused severe emotional distress."  (¶¶ 311, 319-323)  However, the Coverage Agreement does not apply to "any Claim for intentional infliction of emotional distress or negligent infliction of emotional distress" "whether actual or alleged," and "neither the Fund nor any Excess Insurer will have an obligation to pay damages."  (*See* Coverage Agreement at 9-10, Exclusion 28)  Because intentional infliction of emotional distress and negligent infliction of emotional distress have been excluded from the Coverage Agreement, the excess insurer does not have an obligation to pay for such damages, and the Board has not waived its immunity from these claims.  *See J.W.*, 2012 WL 4425439, at *11 (finding board of education's coverage agreement with NCSBT "excluded claims 'for intentional infliction of emotional distress or negligent infliction of emotional distress'. . .[and] explicitly states that the NCSBT '*nor any Excess Insurer* will have an obligation to pay damages'" and holding "the Board does not have excess coverage for claims of intentional infliction of emotional distress and negligent infliction of emotional distress, and the Board has not waived governmental immunity").

3. *Because the Coverage Agreement excludes claims "in connection with" "oral or written publication of material, if done with knowledge of its falsity," the Board has not waived its immunity to Plaintiffs' defamation and libel per se claims in Counts X and XI of the SAC.*

Plaintiffs' claims for defamation and libel per se against the Board are also excluded under the Coverage Agreement.  In support of their defamation claim, Plaintiffs allege the Board "defamed Plaintiff L.B. when, upon information and belief, it falsely communicated that L.B. was guilty of committing sexual harassment."  (¶ 331)  Plaintiffs further allege Defendants "published [these statements] with knowledge and/or reckless disregard of whether it was false" and that "Defendants' defamatory statements were made with malicious, wanton and reckless indifference to the truth."  (¶¶ 333-334)  In support of their libel per se claim, Plaintiffs allege that the written statement that L.B. had engaged in sexual harassment was "libelous on its face as Defendants knew, or had reason to know, that the Plaintiff L.B. did not sexually harass [others]," "[a]t the time of the publication, [the Board] either knew the statement was false or failed to exercise ordinary care to determine whether the statement was false," and

24

that damages can be presumed "by the Defendant with the knowledge that the statement was false or with reckless disregard for its truth or falsity." (¶¶ 354, 356, 362)

In short, Plaintiffs have alleged the Board acted with knowledge or reckless disregard that the information at issue was false. Such allegations, however, fall squarely within the exclusion of the Coverage Agreement for "any Claim for Personal Injury[10] arising out of or in connection with, in whole or in part, (a) dishonest, fraudulent, or criminal acts; (b) acts of reckless or deliberate indifference; or (c) oral or written publication of material, if done with knowledge of its falsity." (Coverage Agreement at 8, Exclusion 13.) While there are some exceptions to this exclusion, there is no excess insurance for any of the claims that fall within the underlying exclusion applicable to claims involving dishonest acts, reckless acts, or acts involving publication of materials. (*Id.*) As a result, the Board has not waived its immunity from claims based on such defamation and libel allegations.

### VI. Plaintiffs' claims for punitive damages must be dismissed as a matter of law.

Finally, Plaintiffs also seek punitive damages in their SAC. However, punitive damages are not available against a board of education as a matter of law. *See, e.g.*, *Ripellino*, 158 N.C. App. at 431 (holding that a county board of education, as a governmental entity, was immune from punitive damages). Thus, to the extent Plaintiffs are permitted to proceed on any claims, their claims for punitive damages against the Board should be dismissed.

### CONCLUSION

Plaintiffs have failed to state claim upon which relief may be granted against the Board for violations of Title IX, Section 1983, and the North Carolina Whistleblower Act. In addition, the Board is immune from Plaintiffs' state law tort claims. For the reasons stated above, the Board respectfully requests that its Motion to Dismiss this action be granted and that Plaintiffs' claims against it be dismissed with prejudice.

---

[10] "Personal Injury" is defined to include an injury other than a bodily injury that arises out of "libel, slander, defamation of character." (Coverage Agreement at 5)

This the 15th day of September 2017.

Respectfully submitted,

/s/ *Melissa J. Michaud*
Deborah R. Stagner (N.C. State Bar No. 24543)
Melissa J. Michaud (N.C. State Bar No. 39919)
THARRINGTON SMITH, L.L.P.
150 Fayetteville Street, Suite 1800 (27601)
Post Office Box 1151
Raleigh, North Carolina 27602-1151
Telephone: (919) 821-4711
Fax: (919) 829-1583
E-mail: dstagner@tharringtonsmith.com
          mmichaud@tharringtonsmith.com
*Attorneys for Defendants Edgecombe Board of*
*Education and John Farrelly*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BOARD'S MOTION TO DISMISS SECOND AMENDED COMPLAINT was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such to the following:

Stacey Gahagan
The Gahagan Law Firm, PLLC
3326 Durham Chapel Hill Blvd, Suite 210-C
Durham, NC 27707
stacey@gahaganlaw.com

Charles L. McLawhorn, Jr.
McLawhorn & Associates, PA
PO Box 8188
Greenville, NC 27835
cmclawhorn@mclawhornlaw.com
*Attorneys for Plaintiffs*

Donna Rascoe
CRANFILL SUMNER & HARTZOG, LLP
5420 Wade Park Boulevard, #300
Raleigh, NC 27607
drascoe@cshlaw.com
*Attorneys for Defendants Marc Whichard, Craig Harris, Bill Strother, Alaina Ritter, Alyssa Parrish-Stafford, Dara Harmon, Miles Stafford and Rebecca Sugg*

This the 15th day of September 2017.

/s/ *Melissa J. Michaud*
Deborah R. Stagner (N.C. State Bar No. 24543)
Melissa J. Michaud (N.C. State Bar No. 39919)
THARRINGTON SMITH, L.L.P.
150 Fayetteville Street, Suite 1800 (27601)
Post Office Box 1151
Raleigh, North Carolina 27602-1151
Telephone: (919) 821-4711
Fax: (919) 829-1583
E-mail: dstagner@tharringtonsmith.com
mmichaud@tharringtonsmith.com
*Attorneys for Defendants Edgecombe Board of Education and John Farrelly*